## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Chapter 11 (Subchapter V)** |
| **JSCO ENTERPRISES, INC..** | § | |
| | § | **Case No. 23-42151-btr** |
| Debtor. | § | |
| | § | |

## CHAPTER 11 SUBCHAPTER V TRUSTEE'S REPORT

NOW COMES, Brad W. Odell, Subchapter V Trustee ("**Trustee**") in the above captioned bankruptcy case (the "**Case**") of JSCo. Enterprises, Inc. (the "**Debtor**"), and files this Chapter 11 Subchapter V Trustee's Report. This Report is being filed pursuant to the Agreed Order Granting in Part Motion of BDO USA, P.C. for Order Expanding the Duties of the Subchapter V Trustee (the "**Expansion Order**").

### I.    Procedural History of the Case

1.    Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") on November 9, 2023. The Debtor elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code.

2.    On November 14, 2023, the United States Trustee for Region 6 appointed Brad W. Odell as the Subchapter V Trustee in this case.

3.    On April 26, 2024, BDO USA, P.C. filed its Motion of BDO USA, P.C. for Order Expanding the Duties of the Subchapter V Trustee (the "**Motion**") [Dkt. No. 97].

4.    On July 19, 2024, the Court entered its Expansion Order [Dkt. No. 140].

5.    Pursuant to the Expansion Order, the Trustee's duties under the Bankruptcy Code were expanded to investigate the Transfer (defined in the Expansion Order) between the Debtor and Durian Foundation. As part of this investigation, the Trustee was to consider the Transfer;

the terms of the Annuity Agreement; the Private Annuity Calculation; the Original Issue Discount Payment Obligation; the Carta Valuation; the potential costs, benefits, and risks to the Debtor's bankruptcy estate (the "**Estate**") in seeking to avoid the Transfer; and any other issues raised in or related to the Motion as the Trustee deemed appropriate.

6.      I have commenced my efforts to investigate the Transfer. To fulfill my expanded duties, I sought court authority to retain Lain, Faulkner & Co., P.C. ("**LainFaulkner**") as professionals to assist with the investigation and to prepare a report regarding the Transfer.

7.      I have exercised my best efforts to fulfill my expanded duties and to investigate the Transfer. This Report contains my analysis of the Transfer, its possible avoidability, and the benefits, costs, and risks to the Estate in bringing an avoidance action. As with any proposed litigation that might ultimately be brought, I cannot assure additional facts or evidence would not come to light during discovery which might affect the analysis contained in this Report.

## II.      Documents Reviewed

8.      As part of my investigation, I reviewed the following documents:

a.      Expert Report of Kelly McCullough with LainFaulkner – Exhibit "A";

b.      Corporate documents for A2Z Associates, Inc.; EverGlade Global, Inc.; JSCo. Enterprises, Inc.;

c.      Corporate documents for EverGlade Consulting, LLC;

d.      Corporate documents for Durian Fiduciary Services, LLC;

e.      Corporate documents for Durian International, LLC;

f.      Trust documents for The Durian Foundation Trust;

g.      Agreement for Purchase and Sale of Membership Interests;

h.      Private Annuity Agreement for EverGlade Global, Inc., including exhibits;

i.      Transfer & Assignment of Membership Interest;

j.     Various contracts and agreements between EverGlade Consulting, LLC and its clients;

k.     Debtor's Schedules and Statement of Financial Affairs;

l.     Pleadings filed in Debtor's Case; and

m.      Website of EverGlade Consulting, LLC.

### III.    Meetings/Conferences

9.     In addition to the documents I reviewed, I participated in meetings, conferences, or communications with the following parties:

a.     Kelly McCullough and Jason Rae with LainFaulkner. LainFaulkner serves as professionals of the Trustee to assist me with my expanded duties.

b.     Charles "Chuck" Gibbs, Russell Hayman, and Alexander Kritikos of McDermott Will & Emery LLP ("**McDermott**"). McDermott serves as counsel to BDO USA, P.C. and other affiliated entities of BDO USA, P.C. (collectively, "**BDO**");

c.     Howard Marc Spector of Spector & Cox, PLLC. Mr. Spector serves as counsel to the Debtor;

d.     David Taylor of Taylor Foley Law Firm. Mr. Taylor prepared the various legal documents associated with the creation of The Durian Foundation Trust, the Transfer, and corporate documents for various entities described herein; and

e.     Lindsey Cooper with Cooper Tierney. Mr. Cooper is special counsel to the Debtor in this Case.

### IV.    Report of Trustee

A. _Formation of the Debtor and its Business_

10.     Mr. Eric Jia-Sobota ("**E. Jia-Sobota**") originally formed A2Z Associates, Inc. ("**A2Z**") as a Delaware Corporation in February of 2020. E. Jia-Sobota held all of the common stock of A2Z. I understand that at the time A2Z was formed, E. Jia-Sobota was a partner with BDO. It is my understanding that as a partner at BDO, E. Jia-Sobota provided government contract consulting services to clients of BDO. His duties included managing BDO's government contract consulting practice. Sometime after the formation of A2Z, E. Jia-Sobota left BDO.

11.     It is alleged by BDO that after E. Jia-Sobota left BDO he started to compete against BDO by providing the same or similar consulting services through A2Z. Likewise, BDO asserts E. Jia-Sobota and the Debtor have violated non-compete agreements and other restrictive agreements entered into between E. Jia-Sobota and BDO. As disclosed in Debtor's Statement of Financial Affairs ("**SOFA**") [Dkt. No. 40], BDO commenced litigation against E. Jia-Sobota and A2Z in the DC Superior Court (the "**DC Litigation**"), which litigation is pending under Case No. 2020 CA 002600 B. *See* SOFA at 3. I understand the DC Litigation to relate to claims for breaches of E. Jia-Sobota's non-compete, non-solicitation, and other restrictive agreements with BDO which was commenced in May of 2020.

12.     In June of 2020, E. Jia-Sobota filed with the Secretary of State, Corporation Division, for the State of Delaware, the First Certificate of Amendment of First Amended and Restated Certificate of Incorporation of A2Z Associates, Inc. amending the name of A2Z to EverGlade Global, Inc. ("**Global**"). Global remained a Delaware corporation. I understand that Global continued to perform the consulting services A2Z was already performing.

13.     In August of 2020, E. Jia-Sobota formed a Delaware limited liability company called EverGlade Consulting, LLC ("**Consulting**"). Global was the sole member of Consulting and the manager of Consulting. E. Jia-Sobota was the president of Global. E. Jia-Sobota was elected to be the CEO, Secretary, and Treasurer of Consulting.

14.     While the common stock of Global was originally held by E. Jia-Sobota, in August of 2021, E. Jia-Sobota transferred fifty-one percent (51%) of the common stock of Global to his partner Jerry Jia-Sobota ("**J. Jia-Sobota**"). I believe that some time after J. Jia-Sobota became the majority shareholder of Global, J. Jia-Sobota became president of Global. E. Jia-Sobota remained the CEO of Global.

15.     I have not been able to determine with exactness how contracts with clients of the consulting business were handled. I have seen contracts between the client and Global, and contracts between the client and Consulting. I believe that after the formation of Consulting, consulting services were being performed by E. Jia-Sobota for clients under both Global and Consulting. I understand, though, that at some point all of the consulting business was done through Consulting, with Global being the sole member and manager of Consulting.

16.     In November of 2022, Global filed with the Texas Secretary of State's Office its Certificate of Conversion of Delaware Corporation Converting to Texas Corporation. Therefore, in November of 2022, Global ceased being a Delaware corporation and now is a Texas corporation.

17.     Similarly in December of 2022, Consulting filed with the Texas Secretary of State's Office its Certificate of Conversion of Delaware Limited Liability Company Converting to Texas Limited Liability Company. Therefore, in December of 2022, Consulting ceased being a Delaware limited liability company and became a Texas limited liability company.

18.     As will be described in more detail herein, in December of 2022, Global sold the membership interests of Consulting to Durian International, LLC, a Wyoming limited liability company. The Transfer was effective January 1, 2023.

19.     In May of 2023, Global filed its Certificate of Amendment with the Texas Secretary of State amending its name from Global to JSCo. Enterprises, Inc., the Debtor. Throughout all of the amendments, conversions, and sale described herein to get from A2Z to JSCo. Enterprises, Inc., E. Jia-Sobota and J. Jia-Sobota were the controlling principals, officers, or directors of these various companies. Likewise, most, if not all, of the corporate documents accomplishing the formation, amendments, and conversions of the various entities were signed by either E. Jia-Sobota or J. Jia-Sobota.

B. *Litigation with BDO*

20.     As set forth on the Debtor's SOFA, there are two lawsuits pending between BDO and the Debtor, as well as other defendants in those lawsuits. I understand that the DC Litigation relates to claims by BDO against E. Jia-Sobota and the Debtor for breaches of the various agreements (non-compete, non-solicitation, etc.) and other torts. I understand the DC Litigation commenced in May of 2020 after E. Jia-Sobota left BDO and commenced his consulting business with the Debtor.

21.     The second lawsuit is pending before the Delaware Superior Court styled *BDO USA, LLP v. JSCo. Enterprises, Inc. (f/k/a EverGlade Global, Inc.)* pending under Case No. N22C-12-063 KSM CCLD (the "**Delaware Litigation**").

22.     A more complete and robust description of the DC Litigation and the Delaware Litigation can be found in BDO's Motion found at Docket No. 97. I understand that the Delaware Litigation commenced in early 2021.

23.     Further, as part of the Delaware Litigation, BDO has acquired a judgment against the Debtor in an amount greater $5 million. The judgment arises from the Debtor's and E. Jia-Sobota's spoliation of evidence and discovery abuses.

24.     All of this litigation was ongoing during the time in which the Debtor and its principals formed new entities, moved Debtor's business to Consulting, amended and converted the Debtor and Consulting to Texas companies from Delaware, and as more fully discussed herein, when Debtor transferred the membership interests of Consulting to the Durian Foundation.

C. *Creation of The Durian Foundation Trust and Transfer of Consulting*

25.     In December of 2022, the Durian Foundation Trust (the "**Foundation**") was formed and settled by Global. To accomplish the formation of the Foundation, two more entities

were created by E. Jia-Sobota and J. Jia-Sobota in Wyoming: Durian Fiduciary Services, LLC and Durian International, LLC.

26.     On December 7, 2022, Articles of Organization were filed with the Wyoming Secretary of State forming Durian Fiduciary Services, LLC ("**Fiduciary**"). Initially, the single-member of Fiduciary was Daniel Paterson ("**Paterson**"), who was an employee of Consulting. Paterson likewise was the sole manager of Fiduciary. I understand that Fiduciary was formed for the sole purpose to act as a corporate trustee of the Foundation.

27.     On December 13, 2022, Articles of Organization were filed with the Wyoming Secretary of State forming Durian International, LLC ("**International**"). Initially, according to the Operating Agreement, the single-member of International was Fiduciary as trustee of the Foundation. The manager of International is Fiduciary.

28.     Capital contributions for both Fiduciary and International were $1.00.

29.     On December 13, 2022, the Durian Foundation Trust Agreement (the "**Trust Agreement**") was executed by Global as settlor and Fiduciary as trustee. The named beneficiaries of the Foundation are E. Jia-Sobota, J. Jia-Sobota, Paterson, and J. Andrew Stiles ("**Stiles**"). The Trust Agreement provided that each beneficiary held one share in the Foundation and created a separate trust for each share in the name of each beneficiary.

30.     The Foundation was funded with $1.00 and the membership interests in International.

31.     J. Jia-Sobota signed the Trust Agreement on behalf of Global as settlor. Paterson signed the Trust Agreement on behalf of Fiduciary.

32.     On December 13, 2022, Global entered into that certain Agreement for Purchase and Sale of Membership Interests ("**Purchase Agreement**") with the Foundation, wherein the

Foundation purchased the membership interests of Consulting. The stated consideration for the purchase was $6,582,000.00.

33.     Instead of having the Foundation actually own the membership interests in Consulting, the Foundation assigned that right to International. Global and International executed the Transfer & Assignment of Membership Interest dated January 1, 2023.

34.     To pay the purchase price for the membership interests of Consulting, the Foundation executed that certain Private Annuity Agreement (the "**Annuity Agreement**") in favor of Global.

35.     All documents executed by the Foundation, Global, and International were signed by J. Jia-Sobota on behalf of Global and Paterson on behalf of International or Fiduciary as the trustee of the Foundation.

36.     After the creation of the Foundation and the Transfer, Paterson and Stiles separated themselves from Consulting, the Foundation, Fiduciary, and International.

37.     As of the time of this report, I understand this to be the following corporate structure of the various entities and trust formed by E. Jia-Sobota and J. Jia-Sobota. The Foundation holds the membership interests in International. The beneficiaries of the Foundation are E. Jia-Sobota and J. Jia-Sobota. The trustee of the Foundation is Fiduciary. Fiduciary is owned and managed solely by E. Jia-Sobota. International's manager is Fiduciary. Consulting is owned now by International. The manager of Consulting is Fiduciary.

38.     As will be discussed more fully in Section D, the total consideration for the transfer of the membership interests in Consulting from the Debtor to the Foundation was the obligations of the Foundation under the Private Annuity Agreement (the "**Transfer**").

39.     The shell game played by E. Jia-Sobota to move what appears to be a valuable government contract consulting business away from the Debtor's creditors has been prolific. The

consulting business started with A2Z. A2Z changed its name to Global. Global then dropped down an LLC called Consulting and moved the consulting business into the new LLC. E. Jia-Sobota and J. Jia-Sobota further moved the consulting business by having the Debtor (Global later changed its name to JSCo. Enterprises, Inc.) transfer the membership interests in Consulting to International which is owned by the Foundation.

40.    All of these moves and transfers occurred while E. Jia-Sobota and the Debtor were being sued by BDO.

D.  *Purchase Agreement and Annuity Agreement*

41.    The consideration for the Transfer is set forth in two principal documents:  the Purchase Agreement and the Annuity Agreement.

42.    The Purchase Agreement provides that the Foundation will pay the $6,582,000 in fixed monthly payments for the remainder of Seller's (i.e., Debtor) lifetime. The Purchase Agreement states this will be done in accordance with the Annuity Agreement.

43.    However, just after this paragraph, the Purchase Agreement specifically states as follows:

> The parties hereby expressly agree that Purchaser's [Foundation] obligation under the [the Purchase Agreement and the Annuity Agreement] shall entirely terminate upon the death of the Seller [Global or the Debtor]….

The Purchase Agreement does not define what it means by the death of the Seller, but I believe it would be interpreted to mean if the Seller (i.e. the Debtor) ceases to exist legally.

44.    The Annuity Agreement likewise contains very specific provisions regarding its payment obligations. First, even though the Purchase Agreement states the monthly payments will be for the Seller's lifetime, the Annuity Agreement provides a Measuring Period which is defined as the effective date of the Annuity Agreement, which was January 1, 2023, and ending on January 1, 2032. The Measuring Period in other words was 9 years.

45.     Payments under the Annuity Agreement were calculated using the Private Annuity Calculation which was Exhibit A to the Annuity Agreement. Based on this calculation, the monthly payments under the Annuity Agreement are $90,433.36. The first payment was due to be paid on February 1, 2023.

46.     The Annuity Agreement likewise took into consideration the payment limitation contained in the Purchase Agreement stating if the obligation of the Payor (i.e. the Foundation) to make the payments terminates before the end of the Measuring Period, then the month in which the payment obligation terminates, the Payor only has to pay the prorated amount of the monthly annuity payment for that month.

47.     While the death of the Seller or Payee (i.e. the Debtor) already created a method by which the Foundation would no longer be responsible for the payment obligations, the Annuity Agreement contains even more provisions dealing with the Payor's (i.e. the Foundation) payment obligation.

48.     The Annuity Agreement specifically provides that if the Payor defaults in the payment of a monthly annuity payment, it will become an obligation of the Payor to the Payee that will come due on January 1, 2062 or January 1, 2063. The Payee cannot force the Payor to make the missed monthly annuity payment until such time as the "obligation" matures.

E.  *Trustee's Understanding of Consulting's Business*

49.     Pursuant to Consulting's website, "EverGlade Consulting connects public sector needs with private sector solutions. We help companies secure and manage non-dilutive federal funding and offer a wide range of services…." *See* https://everglade.com/what-we-do/ (last visited October 31, 2024).

50.     I understand that E. Jia-Sobota is the key member of the Consulting team as he has been involved in the government contract consulting arena for more than two decades. *See*

https://everglade.com/team/eric-jia-sobota/ (last visited October 31, 2024). In E. Jia-Sobota's

bio, it states he is the founder of Consulting and the National Leader of its consulting practice.

*See id.*

51.     As previously mentioned, in reviewing the various contracts and documents

provided, Consulting has entered into multi-year consulting contracts with its clients to provide

the services described on its website. In my review of these contracts, even though the contracts

are for multiple years, some contain termination provisions which allow for the client to

terminate the contract by providing written notice to Consulting.

F. *Analysis of Avoidability of Transfer*

52.     Considering the above and as more fully described herein, I have investigated

whether the Transfer may be subject to avoidance under 11 U.S.C. § 548 of the Bankruptcy

Code. Based on the information and documents obtained and reviewed by me and LainFaulkner,

I am of the opinion that the Transfer most likely is subject to avoidance pursuant to 11 U.S.C.

§ 548.

53.     Section 548 of the Bankruptcy Code permits a trustee to avoid transfers of

property of the debtor that were made within two years of the filing of the bankruptcy case if the

transfer was made with actual intent to hinder, delay, or defraud its creditors (both present or

arising after the transfer); or if the debtor received less than reasonably equivalent value for the

transfer, and the debtor was insolvent at the time of the transfer or became insolvent because of

the transfer, was engaged in business or was about to engage in business for which the debtor

would not be sufficiently capitalized, intended to, or believed it would, incur debts beyond its

ability to pay, or made the transfer to or for the benefit of an insider under an employment

contract and outside the normal course of business.

54.     The Debtor filed this Case on November 9, 2023. The Transfer occurred in December of 2022 and made effective as of January 1, 2023. The Transfer definitely occurred within two years of the filing of the Debtor's Case.

### i.  *Actual Fraud*

55.     I am of the opinion that the Transfer is most likely avoidable based on actual fraud.

56.     The Debtor (originally A2Z Associates, Inc.) originally held the government contract consulting business when E. Jia-Sobota left BDO and started his own consulting company.

57.     Shortly after E. Jia-Sobota started his consulting business with the Debtor, BDO commenced the DC Litigation against E. Jia-Sobota and the Debtor for various claims and causes of action arising out of his agreements with BDO in May of 2020. Originally, BDO named A2Z as a defendant.

58.     Thereafter, E. Jia-Sobota renamed A2Z to Global and in August of 2020 formed Consulting. I understand that Consulting then commenced the government contract consulting business contemporaneously with the Debtor.

59.     Litigation continued between BDO, the Debtor, and E. Jia-Sobota when BDO commenced the Delaware Litigation. The Delaware Litigation included a judgment against the Debtor and E. Jia-Sobota for spoliation of evidence and severe discovery abuses.

60.     Around the time the judgment was coming down in the Delaware Litigation, E. Jia-Sobota formed the Foundation, Fiduciary, and International. The Debtor "sold" the membership interest in Consulting to International. At all times of the creation of the various entities and Foundation, the amendments and conversion of the entities, and the Transfer, E. Jia-Sobota and his partner, J. Jia-Sobota, controlled, held ownership or beneficial interests in, or

were officers and directors of the Debtor, Consulting, the Foundation, Fiduciary, and International.

61.    At all times after the Transfer, E. Jia-Sobota and J. Jia-Sobota retained control, possession, benefit, and use of Consulting, now shielded through several layers of entities: the Foundation which owns International which in turn owns Consulting. Likewise, E. Jia-Sobota owns and controls Fiduciary which is the trustee of the Foundation and manager of both International and Consulting.

62.    The Annuity Agreement, which is the consideration for the sale, is suspect as described in the Report provided by LainFaulkner dated November 1, 2024 (attached as Exhibit "A"), because it contains provisions which make its value highly skeptical and illusory.

63.    The Foundation can default on a monthly annuity payment, and the Debtor cannot enforce the Annuity Agreement until January 1, 2062 or January 1, 2063, some forty years later. Assuming worse case scenario and the Foundation defaults on all remaining monthly annuity payments, the Debtor loses all income for the next thirty-eight to thirty-nine years.

64.    Additional provisions which make the Annuity Agreement and its value illusory are the fact that if the Debtor "dies," the Foundation's obligation under the Annuity Agreement and the Purchase Agreement terminates. Upon such an event, the Foundation retains the consulting business and its revenue streams, and creditors get nothing in a liquidation of the Debtor.

65.    Further problems come to light when one dives deeper into the various corporate governance documents of the Foundation, International, and Consulting. Pursuant to the Third Amended and Restated Operating Agreement for Consulting, the member (International) cannot demand that distributions occur. Similarly, the manager of Consulting determines in its sole

discretion whether or not to make cash distributions. The exact same provisions regarding distributions exist in International's operating agreement.

66.     The Foundation does not hold any assets which are generating any income for the Foundation to make payments to the Debtor. The Foundation relies solely on the income of Consulting which not only must flow to International first, but then from International to the Foundation. All along the path of funds flowing up to the Foundation is E. Jia-Sobota and his ability as controlling the manager (Fiduciary) of both Consulting and International to prevent distributions to the Foundation.

67.     Based on all of this, I assert it is more likely than not that the Transfer would be avoidable for actual fraud. The Debtor and E. Jia-Sobota took all the steps described here to hinder, delay, and defraud BDO during the pendency of the DC Litigation and Delaware Litigation.

### ii.  Constructive Fraud and Lack of Reasonably Equivalent Value

68.     I believe that even if the Transfer is not avoidable for actual fraud the Transfer is avoidable because Debtor received less than reasonably equivalent value for the Transfer, and the Debtor was insolvent or became insolvent on account of the Transfer or the Debtor believed it would have incurred debts beyond its ability to pay.

69.     As set forth in § 548(a)(1)(B) of the Bankruptcy Code, a transfer may be avoided as a fraudulent transfer if the Debtor did not receive reasonably equivalent value and one of four conditions regarding the Debtor's financial condition or the transfer itself is present.

70.     As set forth in the Report of LainFaulkner, the Purchase Agreement and the Annuity Agreement did not provide the Debtor with reasonably equivalent value. Because of the risks discussed associated with the Annuity Agreement, LainFaulkner opined that the value of the Annuity Agreement is nominal at best. As discussed in the Report and herein, the Purchase

Agreement and the Annuity Agreement provide multiple ways for the Foundation to avoid its obligations to the Debtor in payment for the Transfer.

71.     In addition to the lack of reasonably equivalent value, I also believe that the Debtor was insolvent on the date of the transfer or became insolvent because of the transfer.

72.     The Report of LainFaulkner provides their opinion on the Debtor's insolvency. LainFaulkner found that the insolvency prong of the fraudulent transfer statute is met. I share LainFaulkner's opinion on insolvency. I likewise have provided my own independent thoughts on the Debtor's insolvency.

73.     The Debtor's only asset prior to the Transfer was cash and maybe cash equivalents, minimal equipment, and the membership interests of Consulting. The Debtor's liabilities prior to the Transfer were mainly contingent liabilities arising from the DC Litigation and the Delaware Litigation. While the Debtor's liability may have been contingent at this time, the claimed damages by BDO were in the millions. Further, leading up to the Transfer, BDO sought damages against the Debtor and E. Jia-Sobota for their involvement in evidence spoliation and discovery abuses. Ultimately BDO received a judgment for such actions greater than $5 million.

74.     Based on this, I believe the Debtor was insolvent.

75.     Regardless, the Debtor became insolvent because of the Transfer. Debtor's membership interest in Consulting was its most valuable asset. It transferred this asset to the Foundation for the Annuity Agreement. As discussed, the Annuity Agreement has significant risks associated with it that make its value practically nothing. Therefore, on account of the Transfer, the Debtor became insolvent because it significantly reduced its assets by accepting the speculative Annuity Agreement.

76.     Debtor's schedules filed in this bankruptcy case support the fact that the Transfer caused Debtor to be insolvent. Even assuming for argument sake that Debtor's valuation of the Annuity Agreement is correct and does not need any adjustments, Debtor's schedules show that its liabilities are greater than its assets. *See* Schedules at 15 [Dkt. No. 39]. Debtor's Summary of Assets and Liabilities for Non-Individuals shows a total asset value of $5,592,167.65 and total liabilities in the amount of $5,860,112.33.

77.     Further, in addition to insolvency, if the Debtor intended to or believed it would incur more debt than it had the ability to pay, the Transfer can be avoided. Here, this provision is likewise met. Debtor and its main principal E. Jia-Sobota were involved in significant litigation with BDO. Prior to the transfer, the Debtor and E. Jia-Sobota were looking at a judgment for evidence spoliation and discovery abuses of more than $5 million. BDO continues to pursue litigation for additional damages on various causes of action. While the Debtor may not have intended to incur further debts, it surely should have believed it would incur more debt then it could pay back.

78.     This position is bolstered by two actions taken by the Debtor. First, as described throughout this report, the Debtor and its principal E. Jia-Sobota went through an extensive scheme to form entities and a trust to move the consulting business out of the hands of the Debtor. Second, the Debtor filed for bankruptcy acknowledging it does not have the ability to pay back its creditors.

79.     For these reasons, I believe § 548(a)(1)(B)(ii)(III) is met.

80.     Because the Annuity Agreement did not provide the Debtor with reasonably equivalent value, and the Debtor was insolvent at the time of the Transfer or became insolvent on account of the Transfer, or the Debtor believe it would incur debts greater than its ability to repay

them, I believe it is more likely than not that the Transfer is subject to avoidance pursuant to § 548(a)(1)(B).

G. *Other Possible Litigation*

81.     I have not done extensive investigation into other possible causes of action regarding the Debtor, but in investigating the Transfer, the various formation of entities and transactions between them, and the overall scheme here which I believe has been perpetrated by E. Jia-Sobota and J. Jia-Sobota, I believe there may be causes of action owned by the Debtor against E. Jia-Sobota and J. Jia-Sobota for breaches of fiduciary duties, in particular the duty of loyalty.

82.     At all times during the creation of the various entities and the Foundation, the transactions between them, and the Transfer, E. Jia-Sobota or J. Jia-Sobota were owners, directors, and officers of the Debtor and the related entities. I believe all actions taken by E. Jia-Sobota and J. Jia-Sobota were with their sole interest in mind and not that of the Debtor.

83.     Further investigation and discovery would most likely be necessary to determine whether viable claims do in fact exist in favor of the Estate.

H. *Costs, Benefits, and Risks to the Estate*

84.     In addition to being tasked with investigating whether the Transfer might be subject to avoidance, I was tasked with determining the costs, benefits, and risks to the Estate for bringing any avoidance actions or litigation in the Case.

### i. **Benefits**

85.     The benefit to the Estate for bringing an avoidance action will be to bring back into the Estate the Debtor's ownership in Consulting. As set forth in the Report of LainFaulkner, Consulting's revenues for 2022 and 2023 were $6,079,305 and $6,583,595, respectively.

86.     Consulting's net income for 2023 was $1,727,548. In 2023, the Debtor was only entitled to receive under the Annuity Agreement $1,085,200.32. Debtor would have benefited by more than $650,000 had the Debtor still owned the membership interests of Consulting.

87.     Ultimately, having the cash flow of Consulting flow directly to the Debtor as opposed to just the monthly annuity payments is of greater benefit to the Debtor than receiving the monthly annuity payments which will be $1,085,200.32 per year.

88.     Overall, it appears Consulting is a profitable business with expectations its profitability will only increase.

### ii.  Costs

89.     I would anticipate the cost to bring avoidance litigation and other litigation against the Foundation, Fiduciary, International, E. Jia-Sobota, J. Jia-Sobota, and possibly others (the "**Potential Defendants**") would be very costly for the Estate.

90.     I understand that the Potential Defendants assert that the motivation behind the Transfer and actions taken by the Potential Defendants is not related to any intent to defraud its creditors. In discussions with counsel who formed the Foundation, Fiduciary, and International, and who prepared the documents effectuating the Transfer, the Potential Defendants claim these transactions were motivated by two purposes.

91.     The first purpose I was told was based on taxation of the business and how it ultimately flowed up to the owners of the business. I was told the Potential Defendants wanted flexibility on the allocation of tax attributes of Consulting to particular owners.

92.     The second purpose I was told was to create flexibility in bringing on potential new partners into the business. It was explained to me that in order to attract valuable talent in the consulting industry there needed to be an easy mechanism to bring in new partners and

provide them with ownership. I was told the creation of the Foundation and the accompanying entities provided this greater flexibility sought by the Potential Defendants.

93.     While I have not formed an opinion yet as to the veracity of these purposes, I recognize that these defenses would be asserted by the Potential Defendants. Thus, I would expect for there to be a need for significant discovery, including potential discovery disputes as to what information may be privileged and not subject to production.

94.     I would expect for there to be significant costs in retaining expert witnesses. I believe the Estate would have to retain experts on trusts, business formation, and taxation. Additionally, because there would be the issue of the Annuity Agreement and whether it constitutes reasonably equivalent value, further work by financial valuation experts would be necessary.

95.     In addition to the anticipate expert costs, the Estate would incur standard, anticipated litigation costs for retaining counsel and other professionals to assist the Estate with the litigation. Seeing that the Debtor, E. Jia-Sobota, and BDO have already spent millions of dollars in litigation to date, it is not unreasonable in my opinion to expect this litigation to easily reach costs in the high six figures and potential seven figures.

### iii. Risks

96.     As with all litigation, there are risks inherent with litigation. Here, however, there are risks that are outside the scope of the litigation that I see.

97.     First, as has been discussed, I understand that E. Jia-Sobota is not only the face of Consulting but is the primary principal at Consulting who generates the business for the company. I am not aware of any agreements or employment covenants which would prevent E. Jia-Sobota from leaving Consulting if the Transfer was avoided.

98.    In fact, I would expect E. Jia-Sobota to leave Consulting if the Transfer was avoided. This risk is significant because if E. Jia-Sobota is in fact the primary business generator for Consulting, then the Estate should expect or anticipate a sharp decline in business and revenue in Consulting.

99.    In addition to E. Jia-Sobota leaving Consulting, it is likewise a risk that other employees of Consulting will leave as well.

100.    Second, several of the contracts I reviewed contained provisions which provided ways for the clients of Consulting to terminate their contracts early upon simple written notice. Should the first risk mentioned of E. Jia-Sobota leaving Consulting occur, then I would expect that the clients likewise would seek to terminate their contracts with Consulting. Should this happen, the financial condition of Consulting would decline precipitously.

101.    Ultimately, these two risks present a situation where even though the Transfer was avoided, the Estate will not experience a benefit from the avoidance because ultimately Consulting will cease doing business.

## V.    Conclusion

102.    Based on my investigation, it is my opinion that the Transfer is most likely avoidable under § 548 of the Bankruptcy Code. The series of transactions taken by E. Jia-Sobota as the principal of the Debtor to move the consulting business away from the Debtor and into other entities owned and controlled by E. Jia-Sobota appears to me to reach the level of actual fraud. This position is bolstered by the fact that the Debtor and E. Jia-Sobota were involved in significant, on-going litigation with BDO throughout the entirety of these transactions and the Transfer.

103.    Regardless, because the Foundation can defer the monthly annuity payments or take other actions to otherwise avoid the payments under the Annuity Agreement, I believe there

was not reasonably equivalent value given for the Transfer. Likewise at the time of the Transfer the Debtor was insolvent or became insolvent because of the Transfer. Similarly, the Debtor reasonably should have believed it would be incurring debt (i.e. the litigation with BDO) beyond its ability to pay.

104.    Notwithstanding the belief that the Transfer is avoidable, I recognize the risk in avoiding the Transfer and bringing the ownership of Consulting back into the Estate. A settlement between the Estate and the Potential Defendants might provide a more beneficial solution to the Estate than litigation. In my opinion, any settlement should restructure the payment vehicle for the purchase price of Consulting's membership interests, provide collateral and guaranties to assure payment, and contain restrictive covenants to better protect the Debtor from the dissipation of Consulting's financial condition.

WHEREFORE, I submit the following Report to the Court as part of my expanded duties under the Court's Expansion Order for the Court's consideration.

Dated: November 1, 2024.                              Respectfully submitted,

By:    /s/ Brad W. Odell
Brad W. Odell
Texas Bar No. 24065839

1500 Broadway, Suite 700
Lubbock, TX 79401
Email: bodell@mhba.com
Phone: 806-765-7491
***Subchapter V Trustee***

Exhibit "A"

# LainFaulkner

November 1, 2024

**Lain, Faulkner & Co., P.C.**
400 N. St. Paul, Suite 600
Dallas, Texas 75201
214.720.1929 Main
214.720.1450 Fax
www.lainfaulkner.com

Brad Odell
Mullin Hoard & Brown, LLP
PO Box 2585
Lubbock, TX 79408

Re: JSCo Enterprises, Inc, Debtor. United States Bankruptcy Court, Eastern District, Case No. 23-42151, Chapter 11.

Dear Counselor,

The executive summary, narrative report, appendices and soft files together represent my complete rule 26(a)(2)(B) disclosure report and should not be separated.

Sincerely,

Kelly McCullough
CPA, CFF, CGMA, CVA

# Table of Contents

I.      Scope of Engagement ..................................................................................................................3
II.     Summary of Opinions ..................................................................................................................3
III.    Qualifications ..............................................................................................................................3
Kelly McCullough...............................................................................................................................3
IV.     Background ..................................................................................................................................4
    A.  Purchase Agreement ............................................................................................................... 4
    B.  Transfer & Assignment of Membership Interest ..................................................................... 4
    C.  Private Annuity Agreement .................................................................................................... 4
    D.  Name Change ......................................................................................................................... 5
    E.  Corporate Structure ............................................................................................................... 5
    F.  Litigation and Bankruptcy ...................................................................................................... 6
V.      Analysis of Sales Price .................................................................................................................6
    A.  Conclusion – Reasonableness of Sales Price............................................................................ 7
VI.     Reasonably Equivalent Value Analysis .......................................................................................7
    A.  Analysis of Reasonably Equivalent Value – Fair Market Value ............................................... 8
        1.  The Annuity is Debt Financing .......................................................................................9
        2.  What is a Private Annuity?.............................................................................................9
        3.  The Debt is the Obligation of Foundation ...................................................................10
        4.  The Foundation is Insolvent.........................................................................................10
        5.  Terms to Evaluate When Valuing Debt Securities .......................................................10
        6.  Typical Terms to be Analyzed for Debt Securities .......................................................10
        7.  Atypical Debt Terms to be Analyzed for Debt Securities.............................................11
        8.  Quantitative Factors to Analyze ..................................................................................12
        9.  Qualitative Factors ......................................................................................................12
    B.  Conclusion – Reasonably Equivalent Value ........................................................................... 14
VII.    Insolvency .................................................................................................................................14
    A.  Balance Sheet Test: ............................................................................................................... 15
    B.  Conclusion – Insolvency ........................................................................................................ 19
VIII.   Administration ..........................................................................................................................19
    A.  Qualifications ........................................................................................................................ 19
    B.  Compensation ....................................................................................................................... 19
    C.  Facts or Data Considered ...................................................................................................... 19
    D.  Right to Supplement ............................................................................................................. 20

# I.    Scope of Engagement

I have been asked by Brad Odell, Subchapter V Trustee for JSCo, Enterprises, Inc. ("JSCo", "Debtor") to render opinions on certain aspects of the sale transaction whereby the Debtor sold EverGlade Consulting ("Consulting") to the Durian Foundation ("the Foundation"):

1.   was the sales price reasonable and,
2.   was the consideration given reasonably equivalent value and,
3.   did the sale of Consulting render the Debtor insolvent.

# II.    Summary of Opinions

1.   In my opinion, based on my review of the contemporaneously prepared valuation assigned to Consulting, I believe that based on the approach and method used by the third-party valuation firm Carta Valuations, LLC ('Carta'), as well the assumptions Carta was asked to use, the sales price of $6,582,000 is reasonable.
2.   In my opinion, based on my review of the sales transaction, I do not believe that reasonably equivalent value was given to the Debtor for the sale of Consulting to the Foundation.
3.   In my opinion, the sale of Consulting to the Foundation left the Debtor insolvent as of 1/01/23.

# III.    Qualifications

### Kelly McCullough

I am a Director with LainFaulkner. My curriculum vitae (CV) is attached as an appendix to this report. In brief, some of my relevant qualifications are summarized below:

- I have over thirty years of general finance, accounting and consulting experience in providing dispute analysis and various forms of consulting services to clients including services as an expert witness in State and Federal court.
- I have specifically worked in the areas of troubled company and solvency related matters for over 15 years. In that capacity, I have served as post-confirmation trustee, court-appointed receiver, and guardian of the estate in probate court.  My practice frequently includes providing consulting services to Chapter 7 and liquidating trustees to identify fraudulent transfers, preferences and assess a debtor's solvency.
- I have a degree in accounting from Stephen F. Austin State University and an MBA in finance from the University of North Texas.
- I am a Certified Public Accountant, a Certified Global Management Accountant, a Certified Turnaround Professional, and a Certified Valuation Analyst.  I am also credentialed in Certified Financial Forensics with the American Institute of Certified Public Accountants.

# IV.   Background

The Debtor filed Chapter 11 bankruptcy under Subchapter V of the Bankruptcy Code on November 9, 2023.

EverGlade Global, Inc., a Delaware corporation ("Global"), was the sole owner of membership interests of EverGlade Consulting, a Texas limited liability company.  It is believed that Eric Jia-Sobota has at least partial ownership in EverGlade Global and thus had ownership in EverGlade Consulting.

The Durian Foundation is a trust and is the sole owner of Durian International, LLC, ("International") a Wyoming limited liability company.  Eric Jia-Sobota is listed as the Fiduciary/Trustee of Durian Foundation on the 2023 tax return and is also listed as being on the Board of Trustees of Durian International.

Global sold Consulting to the Foundation for $6,582,000 on January 1, 2023.

## A.  Purchase Agreement

Effective January 1, 2023, the Foundation, entered into a purchase agreement whereby the Foundation ("Buyer") would purchase Consulting ("Property") from Global ("Seller") for $6,582,000 for "*fixed monthly payments to Seller in exchange therefore for the rest of the Seller's lifetime in accordance with the terms of this Agreement*".

## B.  Transfer & Assignment of Membership Interest

On January 1, 2023, Global ("Seller") also executed a Transfer & Assignment transferring the Property to International.

## C.  Private Annuity Agreement

For compensation for its interest in the property, Global executed a "Private Annuity Agreement" with Foundation effective January 1, 2023. Under the Annuity Agreement ("Annuity"), Foundation is the "Payor", Global is the "Payee" and Consulting is the "Assets".

The general terms are as follows:
- Monthly payments of $90,433.36 each month from the Payor to the Payee beginning January 1, 2023 through January 1, 2032.
- There are to be 108 total payments totaling $9,766,802.88.
- Any monthly payment due and not paid for any reason by the Payor by the due date for such monthly payment will become an obligation to be paid by the Payor to the Payee at the maturity date and in that face value amount as set for in Exhibit "B" "*Original Issue Discount Payment Obligation Valuations.*"

- Each monthly payment thus missed will be a separate and standalone obligation. Depending on when the payment is missed, these separate and standalone obligations are due by the Payor on either January 1, 2062 or January 1, 2063.
  - For example, a $90,433 payment missed for January 2025 will be then due 38 years later on January 1, 2063 in the amount of $469,110.
- In the event the Payor missed a payment and wishes to pay it before 2062 or 2063, there is a schedule ("Exhibit C") that details the prorated portion to be paid, based on the number of months left remaining until 2063.
- The Payor shall be absolutely liable for the payments due under the Annuity Agreement and such payments are in no way contingent upon the Payor's future earnings from the Assets.
- The Seller/Payee retains no security interest, mortgage, lien or pledge with respect to the Assets transferred.
- The Annuity Agreement will be enforced under the laws of South Carolina.

## D. Name Change

Per the Texas Office of the Secretary State, EverGlade Global, Inc. officially changed its name to JSCo Enterprises, Inc. effective May 18, 2023.

## E. Corporate Structure

Based on a review of the financials, tax returns and other documents:
- The Debtor is the Beneficiary of the Foundation;
- The Foundation owns International; and
- International is the parent of Consulting.



Also, importantly, it appears that essentially all of the activity in the consolidated International financials relate to Consulting; the Foundation does not have any significant asset other than cash and is used only to receive distributions from International (via Consulting) and then remits the Annuity payments from these distributions to the Debtor.

Should Consulting fail, it does not appear that International would have any ability to generate distributions to the Foundation in order to allow the Foundation to then pay the monthly Annuity obligation to the Debtor.

### F.  Litigation and Bankruptcy

There are currently three claims filed in the Debtor's bankruptcy.  The most significant claim filed is by BDO USA, P.C. ("BDO"), which is unliquidated and arises from damages related to pending litigation between the Debtor and BDO and rights to recover from certain indemnified individuals.

In March 2021, BDO sued the Debtor in Delaware Court for defamation, tortious interference with business relations, injunctive relief, civil conspiracy, deceptive trade practices and trade libel.

In January 2023, the Delaware Court entered a default judgment against the Debtor and held that BDO was entitled to fee shifting.

In August 2023, the Delaware Court issued an opinion and order which shifted $5,236,972.77 in fees and costs to the Debtor.  It is alleged that the Debtor has not paid any of these fees and costs. On November 9, 2023, the Debtor filed Chapter 11 bankruptcy under Subchapter V of the Bankruptcy Code.

## V.    Analysis of Sales Price

The sales price was determined by Carta, a third-party valuation firm.  Carta valued Consulting at $6,582,000 using the Market approach, Guideline Public Company Method.

Per the Carta valuation report:

> *"Market approach: Guideline public company method*
> *The Guideline (or Comparable) Publicly Traded Company Methodology within the Market Approach relies on an analysis of publicly traded companies similar in industry and/or business model to the Company. This methodology uses these guideline companies to develop relevant market multiples and ratios, using metrics such as revenue, earnings before interest and taxes (EBIT), earnings before interest, taxes, depreciation and amortization (EBITDA), net income and/or tangible book value. These multiples and values are then applied to the Company's corresponding financial metrics. Since no two companies are perfectly comparable, premiums or discounts may be applied to the subject company's metrics if its position in its industry is significantly different from the position of the guideline companies, or if its intangible attributes are significantly different.*

> *Accordingly, the Guideline (or Comparable) Publicly Traded Company Methodology was utilized with a weighting of 100.00%."*[1]

I reviewed and analyzed the main assumptions used by Carta in the valuation of Consulting. The most significant assumption used by Carta in developing the multiple to be used in valuing Consulting was the revenue trend: NTM revenue ("next twelve months"), 2022 and 2023. I compared these three revenue forecasts to actuals.

**Everglade Consulting**
**Valuation Report Comparison for Forecast to Actual**

|  | NTM* | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
|  | **Actual** | **Forecast in Valuation** | **Actual** | **Forecast in Valuation** | **Actual** | **Forecast in Valuation** |
| **Revenue** | $5,896,095 | $7,000,000 | $6,079,305 | $8,000,000 | $6,583,595 | $10,000,000 |

*\* NTM is October 2022 through September 2023*

The forecasted numbers used by Carta to develop the multiple are higher than the actual numbers for those periods. The NTM forecast of $7M is 16% higher than the actual that was achieved for the twelve-month period of October 2022 through September 2023, but is a reasonable assumption given what was known or knowable at the time Consulting's management developed the forecast.

### A.  Conclusion – Reasonableness of Sales Price

Based on my review of the valuation assigned to Consulting, I believe that based on the approach and method used by Carta, their contemporaneous analysis, the sales price of $6,582,000, is reasonable.

## VI.    Reasonably Equivalent Value Analysis

While the Courts certainly have a wide discretion on how reasonably equivalent value is interpreted, our guidance suggests that there are certain frameworks that an analyst should consider when performing their analysis of reasonably equivalent value. That analysis considers the following [Extracted from Pages 83-85 of the AICPA's Providing Bankruptcy and Reorganization Services Volume 2]:

1. *there is no definition in the Bankruptcy Code for reasonably equivalent value.*

2. *given that different jurisdictions define reasonably equivalent value differently, the term is subject to a variety of interpretations. Accordingly, the assessment must be made after giving consideration to prevailing case law in the relevant district.*

---

[1] Valuation of the liquidation threshold for EverGlade Consulting, Inc., prepared by Carta Valuation LLC on April 6, 2023, page 9.

3. *although fair market value is an important factor for consideration, it is not necessarily dispositive in the ultimate determination.*

1. *value **must be** assessed in "**its broadest sense**, including cash, all interests in property, such as liens, and every kind of consideration including promises to act or forbear to act." In other words, direct, indirect, or contingent benefits, whether immediate or deferred, should be considered when assessing reasonably equivalent value.*

2. *the assessment of reasonably equivalent value is a fact-intensive assessment that must be made after giving consideration to the totality of circumstances existing at the time of the transfer. Two important elements for consideration are set forth in the previous sentence. First, a "totality of circumstances" analysis contemplates assessing the specific circumstances of the debtor. As a result, the question is not, Did the consideration received by the debtor represent a going rate for the goods and services in the marketplace? so much as it is, Did the consideration received provide reasonably equivalent value to the particular debtor, in its given circumstances, from the standpoint of its creditors? Second, the assessment of reasonably equivalent value should be made based on what was known or knowable as of the transfer date. An inappropriate use of hindsight information in the context of avoidance actions would shift the court's focus from "combat[ing] fraud, whether actual or constructive . . . to serving as insurance against financial failure."*

3. *"because fraudulent conveyance laws exist to protect creditors, 'the question whether the debtor received reasonable value must be determined from the standpoint of the creditors.'" Accordingly, the question is not, did the transfer constitute a benefit that provided adequate enjoyment to the debtor? So much as it is, did the debtor receive value that might ultimately inure to the benefit of its creditors?*

The guidance also suggests that these factors are written by legal and not financial authors, so careful consideration should be given to the literature and accepted methodologies when applying them to an assessment.

I have analyzed the transaction with this guidance as a framework for our review and critique.

## A. Analysis of Reasonably Equivalent Value – Fair Market Value

Fair market value is perhaps the most well-known standard of value and is commonly applied in judicial and regulatory matters. Fair market value applies to virtually all federal and state tax matters, including estate, gift, inheritance, income, and ad valorem taxes, as well as many other valuation situations.

The American Institute of Certified Public Accountants, Statements on Standards for Valuation Services No. 1 defines Fair Market Value as:

> *"the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."*

Cash equivalents are defined as those items that can be converted to cash immediately.

### 1. The Annuity is Debt Financing

Here, the transaction was not consummated in terms of a cash payment upon closing but rather a complex financing arrangement referred to as the "Private Annuity Agreement" which is not an instrument that can be immediately converted to cash. The transaction is essentially a financing mechanism.

Accordingly, the Annuity is the consideration I analyzed to determine if the Debtor received reasonably equivalent value.

The Annuity provides for 108 monthly $90,433.36 payments (nine years) for a total of $9,766,802.88. The payment period is January 1, 2023 through January 1, 2032.

This $9.7M payment stream is the attempt to convert the $6.5M sales price to a fair market value incorporating the time value of money on a quantitative basis.

### 2. What is a Private Annuity?

Per the "White Paper: Private Annuities: by Select Portfolio Management, Inc., a private annuity is an unsecured, private financing agreement:

> "*A private annuity is sometimes used to fund the lifetime sale of a business interest to a relative or to the business itself. It is an unsecured, open-ended installment sale agreement between two parties in which the buyer promises to make payments of a set amount (the annuity) to the seller for the rest of the seller's life, based on the seller's life expectancy as determined by mortality (actuarial) tables. Unlike an annuity contract purchased from a commercial insurance company, a private annuity is a contract with a private individual or organization. A private annuity can't be secured by a note or by collateral (i.e., you can't take your property back if your buyer decides to quit paying).*"

It is important to note that a private annuity be unsecured in order to qualify for the favorable tax treatment permitted by the IRS.

The "*White Paper: Private Annuities*" by Select Portfolio Management, Inc. also addresses risk tolerance involved in a private annuity:

> "*If you are confident that your buyer will be able to make payments to you for the rest of your life in exchange for your business interest, then using a private annuity to fund the purchase may be appropriate for the sale of your interest. On the other hand, if you would like more certainty that payment for you interest will be both available and in full, you may want to consider alternative financing methods such as secured installment payments.*"[2]

---

[2] The "*White Paper: Private Annuities*" by Select Portfolio Management, Inc. is included in the appendix to this report.

Another distinctive feature about the private annuity is that it is usually between family members, as its unsecured nature requires a high degree of trust.

### 3.   The Debt is the Obligation of Foundation

The Annuity payments are the obligation of the Foundation.

As discussed in the "Corporate Structure" section above, the Foundation does not have any income producing ability other than the distributions it receives from International.  International does not appear to have any material income producing ability other than what it receives from Consulting. Consulting appears to be the only entity owned/controlled by the Foundation that can generate any material cashflow.

### 4.   The Foundation is Insolvent

The year-end 2023 Foundation balance sheet lists cash of $92,000 as its only asset and curiously does not list any liabilities; including the Annuity.  However, when properly considering the Annuity obligation as a debt, the Foundation is at the very least Balance Sheet insolvent.

### 5.   Terms to Evaluate When Valuing Debt Securities

Per Valuing a Business, 5th Edition, by Shannon Pratt, page 556:

> *"Special Characteristics of Various Debt Securities*
> *In estimating the value of a debt security, it is extremely important to analyze the security's various characteristics or provisions that may impact on its value. In addition, if guideline publicly traded debt securities are used in the valuation, any differences between the provisions of the security being valued and those of the guideline securities should be considered. The following discussion focuses on some of the most common provisions of various debt securities that should be analyzed in the valuation process.*
>
> *Collateral Provisions*
> *A debt security that has no pledge of specific property or assets as collateral for the debt is called a debenture. Although a debenture clearly will require a higher yield to maturity than an identical security secured by a specific asset, indenture provisions designed to protect the debtholder will reduce the relative risk associated with the debenture. Such indenture provisions might include restrictions on the amount of additional debentures the debtor can issue before paying off the original debentures; restrictions on the payment of cash dividends to equity owners."*

### 6.   Typical Terms to be Analyzed for Debt Securities

To reiterate, the terms typically analyzed regarding debt financing obligations include:

- Collateral
- Debt limits
- Management compensation
- Shareholder distributions
- Debt covenants (i.e. DSCR, Working Capital, etc.)

In other words, in order to assess the marketability of the financing instrument, we would determine what contractual obligations exist in connection with the debt. In this case there are no protective measures for the seller in place. In fact, the entity responsible for making the annuity payments (Foundation) is not even the same entity that generates the cashflow (Consulting).

| Debt Financing Obligations | Amount |
|---|---|
| Collateral | None |
| Debt Limits | None |
| Management Compensation | No Restrictions |
| Shareholder Distributions | No Limits |
| Debt Covenants | None |

There is nothing stopping Consulting from incurring non-market management compensation, incurring additional debt for a debt/equity recapitalization, making excessive dividends/distributions and leaving the Foundation without sufficient funds available to service the Annuity, either in the January 1, 2023 through January 1, 2032 payment timeframe or the deferred payment due dates in 2062/63.

There are no requirements that I could identify regarding International's requirements to make payments to the Foundation (no excess cash requirements, etc.) --- it appears it is completely discretionary.

### 7. Atypical Debt Terms to be Analyzed for Debt Securities

### a. Debt is Unsecured

To comply with tax law, the Seller must be unsecured or else there will be negative tax consequences for the Buyer. As previously discussed, a private annuity must be unsecured in order to qualify for the favorable tax treatment permitted by the IRS.

### b. Unusual Non-payment Term

The Annuity Agreement includes a non-payment term not typically seen when a seller is selling the business to a third party in an arm's length transaction. In the event the payor cannot make a monthly payment, there is a non-payment clause that allows payment to be deferred until January 1, 2063 or January 1, 2062, depending on the date the payment is originally due. Any payments missed as of the date of this report will be due 37 and 38 years respectively in the future. *The Seller will have no legal recourse to pursue any missed payments until at least 2062.*

For instance, these missed payments could range from:

- $509,725 for a payment missed on February 1, 2023 and will be due on January 1, 2063
- $346,397 for a payment missed on January 1, 2032, and will be due on January 1, 2062

The Payor may catch up any missed payments before 2062/63 based on factors in the "Call Table" in the Annuity Agreement based on remaining months to maturity.

### c. Each Missed Payment a Stand-Alone Obligation

Additionally, each missed payment is a stand-alone obligation, requiring the seller to pursue each missed payment individually.

### 8. Quantitative Factors to Analyze

A buyer of this annuity (assuming it is legal to sell) would evaluate it over a 40-year time frame, as it is clear that the Annuity allows for payment to be deferred until January 1, 2062 and January 1, 2063.

The buyer would compute the net present value of the income stream, assuming the annuity payments would occur in 2062 and 2063. Depending on the discounts the buyers deems appropriate, this will bring the value down considerably.

I have reviewed a schedule of NYSE Bonds that are publicly traded. Of the over 300 bonds listed, I was unable to find any with maturity dates in 2062 or 2063, with the vast majority due in the 2025-2035 range. However, I did find two with maturity dates of 2053/54.

| Issuer | Coupon Rate | Maturity Date | Face Value | Last Trade 10/29/24 |
|---|---|---|---|---|
| Duke Energy | 6.10% | 2053 | $1,000 | 104.07 |
| Realty Income | 5.38% | 2054 | $1,000 | 97.54 |

These two bonds are discounted to roughly 10% of the face value. The issuers are very large companies with a long history, are asset heavy and are a known quantity, none of which apply to the Foundation, which is less than three years old, and has no operations and no assets. The "face value" of the Annuity that would be due in 2062 is $39 million. This obligation would certainly be discounted at least as much as Duke Energy and Realty Income Corporation, so without any additional discounting, would be worth no more than $3.9 million (and even less than that as the "maturity date" of 2062 is almost ten years longer).

### 9. Qualitative Factors

The quantitative analysis above will provide the buyer with value based on the net present value of the cash flows after discounting for the various risks to those cash flows. However, in this instance, the unusual qualitative factors drive the fair market value of the Annuity. There are several issues related to the Annuity structure that would give any potential buyer of this Annuity pause.

The sale transaction between the Foundation and Consulting was not an arm's length transaction because the two parties were related; both entities being at least partially owned or controlled by Eric Jia-Sobota. This could account for atypical terms of the Annuity Agreement.

#### a. Investment Timeframe

As discussed above, the Foundation has the right to defer payment for 40 years. This is an extraordinarily long investment timeframe and well beyond what is normally seen in unsecured debt instruments, especially from an entity with no operations and no assets. The eventual payoff and/or collection action will almost certainly be handled by the purchaser's beneficiaries.

### b.  The Foundation Has No Assets

Even a cursory analysis of the financial wherewithal of the Foundation would show the entity has no operations and no assets and thus no innate ability to make the payments.  This is obviously extremely unattractive.

### c.  Will the Foundation and Consulting exist in 2062?

Another material qualitative consideration for a potential buyer of the Annuity is, will both the Foundation and the source of cash, Consulting, be in existence in 2062/63.  Statistically, the odds are against it.  Based on a study done by the Federal Bureau of Labor and Statistics[3], for the 30-year period of 1994-2024, only 13.1% of companies started in 1994 were still operating 30 years later in 2024.  Given that the Debtor, the Foundation and Consulting must survive for 40 years, the buyer would give that a one in ten chance at best and would discount the value accordingly.

### d.  Legal Costs and Judgement against the Foundation

In the event the Debtor, the Foundation and Consulting survive another forty years, the buyer would need to consider the costs of monitoring this investment for 40 years and in the event that Foundation defaults, pursue each missed obligation as a separate debt in court (potentially 108 separate actions).  However, once a judgement is obtained against Foundation, collectability would be an issue, as the Foundation may not have any assets.  This would negatively impact the value of the Annuity as well.

### e.  Principle of Substitution

Under the FMV principle of substitution--- a reasonably informed investor would seek out an investment that was more consistent with the market with standard marketable financing terms.

> *"PRINCIPLE OF SUBSTITUTION*
> *The principle of substitution is a presupposition of appraisal practice, expressing a generalized prediction concerning behavior related to an event involving economic choices and values. It predicts how people will normally choose among comparable properties when prices vary. In English, prudent individuals will not pay more for something than they would pay for an equally desirable substitute. The principle of substitution, in essence, states that nobody will pay more for something than he or she would pay for an equally desirable substitute. Logically, if two items are identical except for the price, a willing buyer will gravitate to the item with the lower price. This is also illustrated in the investment field. If two investments have equal risk, an investor will invest in the item that will provide the greatest return on investment."[4]*

---

[3] https://www.bls.gov/bdm/us_age_naics_00_table5.txt and https://www.bls.gov/bdm/us_age_naics_00_table7.txt
[4] Gary R. Trugman, Understanding Business Valuation, Sixth Edition, Business Valuation Resources, LLC, 2022, pages 105-106.

## B. Conclusion – Reasonably Equivalent Value

In my opinion, the Annuity as consideration did not provide the Debtor with reasonably equivalent value.

This transaction must be evaluated in "***its broadest sense***, *including cash, all interests in property, such as liens, and every kind of consideration including promises to act or forbear to act."*

The "forbear to act" is especially material in this instance, as the Foundation has the right to forbear payments for 40 years.

A buyer with "reasonable knowledge of the relevant facts" looking to purchase this annuity would come to the determination that the unusual terms and conditions would effectively make this a 40 year IOU from an entity with no assets and no operations and so would pay significantly less (if anything) than the $6,582,000 value of the asset sold to the Foundation.

While the cash purchase price is reasonable, the fair market value of the financing arrangement per the terms of the Annuity would make the sale commercially unviable.  It is difficult to imagine where an informed buyer, assessing all the relevant factors, would pay any more than a nominal amount for the chance to cash in 40 years later.


# VII.   Insolvency

I was also asked to determine if the Debtor was insolvent or rendered insolvent at the time of the transfer; the transfer being the sale of Consulting to the Foundation and the transfer date being 1/01/23.

In summary, under federal and state fraudulent transfer law, there are three widely recognized tests of financial distress or insolvency for the analyst to consider:
1. The inability to pay debts as they become due test;
2. The insufficient capital or assets test; and
3. The adjusted balance sheet test.

The failure of any one of these tests is an indicator of insolvency.

A solvency/insolvency analysis, as defined by the American Institute of Certified Public Accountants and certain nationally recognized valuation credentialing organizations, is a yes or no proposition (the entity is solvent or is not solvent).  A solvency/insolvency analysis does not represent a complete Opinion of Value or Calculation of Value as defined by the American Institute of Certified Public Accountants and certain nationally recognized valuation credentialing organizations. In accordance with the requirements of those organizations and regulating bodies, I do not have and do not offer any opinion on the specific dollar amount of solvency or insolvency of the Debtor at any point in time.

When forming my solvent/insolvent yes/no opinions, I have utilized certain generally accepted[5] business valuation, accounting and financial methodologies typically used in solvency/insolvency analysis work. Those analysis and support schedules represent the primary basis for my insolvency opinions. Those analysis and support schedules, which are contained in the 'Insolvency Bases and Calculations' section of the Appendix to this report, do not represent an opinion of value engagement work product and do not represent specific solvent/insolvency dollar opinions.

### A. Balance Sheet Test:

Under the "Balance Sheet Test," an insolvency occurs when "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation[6]."

The fallacy of this misconception of the bankruptcy "Balance Sheet (Insolvency) Test":

> *"Net book value (often called book value, in the vernacular) is synonymous with the amount of owners' equity recorded on the company's cost-basis balance sheet."[7]*
> *"From a valuation perspective, the terms book value or net book value are merely accounting jargon."[8]*
>
> *"In fact, accounting **book value is not a business valuation method at all…"[9]** (Emphasis Added)*
>
> *"There is no theoretical support, conceptual reasoning, or empirical data to suggest that the value of a business enterprise (under any standard of value) will necessarily equal the company's accounting book value."[10]*
>
> *"Under any standard of value, the true economic value of a business enterprise equals the company's accounting book value **only by coincidence.**"[11] (Emphasis Added)*
>
> *"Analysts use the company's cost-based balance sheet **only as a point of departure from which to begin the valuation.**"[12] (Emphasis Added)*

---

[5] Peer-reviewed publications and learned treatises addressing insolvency analysis are listed in the 'Data and Information Considered' section of the report.

[6] Texas Uniform Fraudulent Transfer Act ("TUFTA")

[7] Shannon P. Pratt & Alina V Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill Companies, 2008, page 352.

[8] Shannon P. Pratt & Alina V Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill Companies, 2008, page 352.

[9] Shannon P. Pratt & Alina V Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill Companies, 2008, page 352.

[10] Shannon P. Pratt & Alina V Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill Companies, 2008, page 352.

[11] Shannon P. Pratt & Alina V Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill Companies, 2008, page 351.

[12] Shannon P. Pratt & Alina V Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill Companies, 2008, page 351.

Due to the company's lack of ongoing operations and inability to generate any profits or returns to equity holders, a knowledgeable and reasonable buyer would likely ascribe no value to the ongoing earning capacity of the Debtor's operation.

Given that the Debtor's only has the right to receive discretionary payments under the annuity agreement, there is no going concern value to assess.  As a result, I have prepared this analysis using an asset-based approach under a liquidation premise of value, a common and generally accepted approach for such analysis.

As detailed above, in order to determine whether the Debtor's balance sheet at fair value is sufficient to indicate that the Debtor is solvent, we would need to adjust certain assets and certain liabilities to fair value in order to make this assessment.  Below are the steps used in the Asset Approach:

> *Developing a value estimate using the asset approach typically involves the following steps:*
>
> *1. Obtain the balance sheet as of, or as near as possible but prior to, the valuation date.*
>
> *2. Adjust the balance sheet, if necessary, for any known unrecorded or off-balance-sheet assets and for any known unrecorded, off-balance-sheet or contingent liabilities.*
>
> *3. Adjust each identified asset to its appraised value, based on the appropriate standard and premise of value, as of the valuation date.*
>
> *4. Adjust each liability to an appropriate value or amount, if materially different from its book value, given the appropriate standard or premise of value. For example, in some contexts, an ap-praised or settlement value may reflect the appropriate estimate, whereas in other contexts, **the face value of the debt or the amount that would be indicative of the amount of an allowed claim in a bankruptcy proceeding may provide the appropriate estimate.***
>
> *5. **If appropriate, make adjustments for income taxes and transaction costs**.*
>
> *6. **Subtract the value of the liabilities from the value of the assets to derive the value of total equity**. If the company has preferred stock or other senior equity securities, then the equity value must be reduced by the value of those securities to determine the value of the common equity.*
>
> *7. Perform "sanity checks" to determine the reasonableness of the values computed in steps (1) through (6).*
>
> *8. **Determine whether the net value computed should be adjusted for any applicable discounts**." [13]*

I applied generally accepted and peer reviewed methodology in determining the values of assets and liabilities.  These steps are well documented in a variety of valuation literature.  As an example, here the steps generally considered when conducting such an analysis:

---

[13] Forensic & Valuation Services Practice Aid Providing Bankruptcy and Reorganization Services, 2nd Edition, Volume 2 — Valuation in Bankruptcy, 2016 by American Institute of Certified Public Accountants, Inc. New York, NY, page 56.

> *"Developing a value estimate using the asset approach typically involves the following steps:*
>
> *1. Obtain the balance sheet as of, or as near as possible but prior to, the valuation date.*
>
> *2. Adjust the balance sheet, if necessary, for any known unrecorded or off-balance-sheet assets and for any known unrecorded, off-balance-sheet or contingent liabilities.*
>
> *3. Adjust each identified asset to its appraised value, based on the appropriate standard and premise of value, as of the valuation date.*
>
> *4. Adjust each liability to an appropriate value or amount, if materially different from its book value, given the appropriate standard or premise of value. For example, in some contexts, an appraised or settlement value may reflect the appropriate estimate, whereas in other contexts, the face value of the debt or the amount that would be indicative of the amount of an allowed claim in a bankruptcy proceeding may provide the appropriate estimate.*
>
> *5. If appropriate, make adjustments for income taxes and transaction costs.*
>
> *6. Subtract the value of the liabilities from the value of the assets to derive the value of total equity. If the company has preferred stock or other senior equity securities, then the equity value must be reduced by the value of those securities to determine the value of the common equity.*
>
> *7. Perform "sanity checks" to determine the reasonableness of the values computed in steps (1) through (6).*
>
> *8. Determine whether the net value computed should be adjusted for any applicable discounts."* [14]

One of the steps requires the analyst to adjust each liability to an appropriate value or amount. In this case, there was significant ongoing litigation for which a contingent liability must be considered.

From the generally accepted, peer-reviewed treatise Contested Valuation in Corporate Bankruptcy, A Collier Monograph, editors: Stark, Siegel and Weisfelner, LEXIS-NEXIS, 2011(With a forward from Judge J. Michael Lynn.).

Contingent liabilities, page 2 – 11

> *"Contingent liabilities, including liability as surety or guarantor, or considered in determining solvency.*[15] *Courts only take into account contingent liabilities arising from foreseeable events that might occur while the debtor remains a going concern.*[16] *Typically, courts will not assess*

---

[14] Forensic & Valuation Services Practice Aid Providing Bankruptcy and Reorganization Services, 2nd Edition, Volume 2 — Valuation in Bankruptcy, 2016 by American Institute of Certified Public Accountants, Inc. New York, NY, page 56.

[15] In re Xonics Photochemical Inc., 841 F.2d 198, 200 (7th Cir. 1988). Official Comm. Of Unsecured Creditors v. Mellon Bankr, N.A. (In re R.M.L., Inc.), 187 B.R. 455, 465 (Bankr. M.D. Pa. 1995),aff'd, 92 F.3d 139 (3d Cir. 1996); Travellers Int'l, AG v. TWA (In re TWA), 134 F.3d 188, 197 (3d Cir. 1998) ("It is proper to consider continent liabilities when evaluating the insolvency of a corporation pursuant to 11 U.S.C. § 101(32)(A).").

[16] See Travelers Int'l, AG v. TWA (in re TWA), 134F.3d 188, 197 (3d Cir. 1998) (refusing to consider contingent liabilities associated with the dissolution of the debtor, because their occurrence would be after the company ceased to be a going concern.)

*contingent liabilities at face value. Rather, the contingent liability is often discounted by the probability the contingency will actually occur, thus reducing it to a present or expected value that is a fraction of its face value.[17] This assessment is more an art than a science, and, accordingly, courts have wide latitude when determining whether the manifestation of a contingent obligation is sufficiently likely to justify inclusion in the insolvency determination, and discretion to apply dollar value to the contingency for valuation purposes."*

The Debtor retained no assets or operations after 1/01/23 and so had no going concern value. As the Debtor had no assets, a liability of any amount would render the Debtor insolvent.

I have determined that the recording of a litigation damages liability on 1/01/23 of any amount will cause the Debtor to become insolvent. However, in order to assist the trier of fact, below is a range of possible contingent litigation liabilities which may could have been recorded by the Debtor had litigation counsel advised the Debtor as to discounted litigation risk would be.

For perspective purposes when considering the probability percentage:
- $772,391 is the amount of fee shifting damages that the Debtor proposed to the Court when contesting the judgement amount and represents 15% of the final judgement amount.
- $5,236,972.77 is the amount of the final judgement against the Debtor and represents 100% of the final judgement amount.

The following summarizes my analysis regarding each of these tests over the relevant time period.

**Everglade Global**
**Balance Sheet as of 1/1/23 Transfer Date**

|  | Book Value B/S (*Unadjusted* before Transfer) | Fair Value Balance Sheets with Contingent Liability of: | |
|---|---|---|---|
|  |  | $772,391.00 | $5,236,973 |
|  | 12/31/22 | 1/1/23 | 1/1/23 |
| Assets |  |  |  |
| Current Assets |  |  |  |
| Bank Accounts | $195,220.82 | $0.00 | $0.00 |
| Accounts Receivable | $360,000.00 | $0.00 | $0.00 |
| Other Current Assets | $0.00 | $0.00 | $0.00 |
| Total Current Assets | $555,220.82 | $0.00 | $0.00 |
| Other Assets | $1,266.70 | $0.00 | $0.00 |
| Total Assets | $556,487.52 | $0.00 | $0.00 |
|  |  |  |  |
| Liabilities and Equity |  |  |  |
| Liabilities |  |  |  |
| Current Liabilities |  |  |  |
| Accounts Payable | $78,903.71 | $0.00 | $0.00 |
| Credit Cards | $23,597.02 | $0.00 | $0.00 |
| Other Current Liabilities | $924,231.14 | $0.00 | $0.00 |
| Total Current Liabilities | $1,026,731.87 | $0.00 | $0.00 |
| Long-Term Liabilities | $512,919.66 | $0.00 | $0.00 |
| *Contingent Liabilities* |  | $772,391.53 | $5,236,972.77 |
| Total Liabilities | $1,539,651.53 | $772,391.53 | $5,236,972.77 |
|  |  |  |  |
| Equity | ($983,164.01) | ($772,391.53) * | ($5,236,972.77) ** |
| Total Liabilities and Equity | $556,487.52 | $0.00 | $0.00 |
|  |  |  |  |
| B/S Solvent/(Insolvent) after Transfer |  | ($772,391.53) | ($5,236,972.77) |

\* Per Exhibit E of Claim 3-1 filed in Debtor's bankruptcy, this is the Debtor's requested amount to lower the judgement to.
\*\* Per Exhibit E of Claim 3-1 filed in Debtor's bankruptcy, this is the judgement awarded against the Debtor.

---

[17] Xonics Photochemical Inc., 840 F.2d 198, 200 (7th Cir. 1988) (holding that a company is not bankrupt merely because the face value of its contingent liabilities exceed its assets).

In addition, as the Debtor has no assets nor any operations from which to generate profits, the Debtor fails the other two solvency tests as of 1/01/23 as so is also insolvent per those two tests:

1. The inability to pay debts as they become due test;
2. The insufficient capital or assets test.

Clearly, without any ability to generate income, the Debtor does not have the ability to pay debts as they become due.

Also, as the Debtor has no or only minimal assets, it lacks sufficient capital to service any amount of debt therefore has insufficient capital.

## B. Conclusion – Insolvency

In my opinion, the sale of Consulting to the Foundation left the Debtor insolvent on 1/01/23.

# VIII.    Administration

## A. Qualifications

My Qualifications are summarized in more detail in my CV that is included as Appendix A.

## B. Compensation

My compensation for completing this engagement is not contingent upon the development or reporting of a predetermined conclusion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this report, its exhibits or its appendices. All compensation charges on this engagement was or will be based only upon Lain Faulkner's published, effective hourly rates for the actual professional hours incurred when those rates were in effect. For the individuals who performed the majority of the work on this engagement, the current, published hourly rates are: Director/Partner $500 and Credentialed Analyst $295.

## C. Facts or Data Considered

A list of documents received and considered is included as Appendix B to this report, including the following information that was relied upon and considered:

- Consolidated Financial Statements
- Tax Returns
- Durian Foundation Management Reports
- Private Annuity Agreement for EverGlade Global, Inc.
- Transfer & Assignment of Membership Interest in EverGlade Consulting, LLC
- Agreement for Purchase & Sale of Membership Interests in Everglade Consulting, LLC
- Valuation of the liquidation threshold for EverGlade Consulting, LLC, Valuation date Oct. 20, 2022 Prepared by Carta Valuations LLC on April 6, 2023
- Claims Register

- #3-1 BDO USA, PC Claim
- Bureau of Labor Statistics, US business age tables
- AICPA Business Valuation Standards
- AICPA's Providing Bankruptcy and Reorganization Services Volume 2
- Understanding Business Valuation, Sixth Edition, by Gary Trugman
- Valuing a Business, 5th Edition, by Shannon Pratt
- Texas Uniform Fraudulent Transfer Act ("TUFTA")
- White Paper: Private Annuities by Select Portfolio Management, Inc.

## D. Right to Supplement

I reserve the right to supplement this report based upon the receipt of new information.

Sincerely,

Kelly McCullough
CPA, CFF, CGMA, CVA