## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| JSCo Enterprises, Inc. | § | Case Number 23-42151 |
| | § | |
| Debtor. | § | (Chapter 11) |

---

## BDO USA, P.C.'S OBJECTION TO DEBTOR'S MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR ENTRY OF ORDER APPROVING SETTLEMENT AGREEMENT

---

BDO USA, P.C. ("BDO"), a creditor, by its undersigned counsel, objects to Debtor's *Expedited Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Entry of Order Approving Settlement Agreement* ("Motion"). Dkt. 210. In support of its objection, BDO states as follows:

## I.     INTRODUCTION

1.     BDO's adversarial relationship with Debtor and its principals Eric and Jerry Jia-Sobota began nearly five years ago when Eric Jia-Sobota formed Debtor while still a BDO partner and tried to take with him the BDO clients and employees of a business unit that annually generated $40 million of revenue. Rather than treating the issue as a routine business dispute over the scope of an employee's restrictive covenants, Jia-Sobota and Debtor launched a repulsive social media smear campaign to try to coerce BDO to settle its arbitration and litigation over Jia-Sobota's restrictive covenants.

2.     When BDO sued Debtor for the smear campaign, the Jia-Sobotas destroyed all evidence in their possession, prompting the Chancellor of the Delaware Chancery Court to observe that she had never seen such egregious spoliation during her time in private practice or on the

1

bench. When confronted with indisputable evidence of spoliation, Jia-Sobota lied repeatedly under oath. When the multimillion-dollar sanction for Debtor's extensive discovery misconduct was imminent, the Jia-Sobotas sprang into action to fraudulently transfer Debtor's operating business to a putative irrevocable trust to shield them from the Chancery Court's judgment.

3.      Despite the diligent efforts of the Subchapter V Trustee here, the material terms of the proposed settlement agreement are missing and virtually none of the information needed to assess the reasonableness of its terms has been provided to BDO. In short, the proposed settlement agreement is reliant on the Durian entities and Jia-Sobotas (collectively with Daniel Paterson and Andrew Stiles, the "Transferees") acting with near-saintly good faith. To say the least, the Transferees' actions in the past five years have not shown that such blind trust is warranted. The near-certain end result of the proposed settlement is that BDO would be paid pennies on the dollar and the Transferees would profit handsomely from their scheme. The Court must reject the proposed settlement agreement or, in the alternative, hear testimony from the Trustee at the scheduled March 25 hearing and then continue the hearing on the merits of the proposed settlement agreement to give BDO sufficient time to obtain the needed documents and supplement this Objection to the proposed settlement agreement.

4.      BDO is the sole non-insider creditor and vehemently opposes the proposed settlement, which is effectively an agreement with the Jia-Sobotas on one side (as principals of the Debtor) and the Jia-Sobotas on the other side (as controlling all of the Transferees). Further, BDO did not negotiate the terms of this agreement with the Transferees. In these circumstances, any proposed settlement must be closely scrutinized by the Court, and the proposed settlement here shows why. The proposed settlement agreement is an agreement to agree, not a final agreement,

and the same two individuals (the Jia-Sobotas) will be on both sides of the table to finalize the agreement if the Court were to approve the proposed settlement agreement.

5.     Debtor and the Transferees are engaged in a tripartite strategy to deprive BDO of its ability to provide a fulsome objection to Debtor's deficient and incomplete proposed settlement agreement. First, the Transferees (all controlled by the Jia-Sobotas) waited until the eleventh hour to agree to a settlement to prevent BDO from having sufficient time to fully formulate its objection. Nothing has changed for the Transferees since April of last year when BDO first requested leave for the Trustee to pursue fraudulent transfer claims, nor has anything changed since November of last year when the Trustee began negotiations. The settlement agreement was purportedly not finalized until the afternoon of Thursday March 20, and Debtor now seeks approval of that agreement three business days later at a hearing scheduled for Tuesday, March 25.

6.     Second, Debtor asks the Court to approve an incomplete settlement agreement. The settlement agreement is premised on a Restructured Annuity Agreement. No such document exists. The Debtor acknowledges as much. One of the "Further Assurances" in the proposed settlement agreement is that if the settlement is approved, the parties will execute the Restructured Annuity Agreement. This is no better than saying the Court must approve the settlement agreement to find out what will be in it.

7.     Third, BDO cannot have a meaningful opportunity to evaluate the terms of the settlement agreement without supporting documents. Most fundamentally, BDO has no idea if the Transferees have profited millions of dollars from the fraudulent transfer in the last few years. The Trustee's report indicates that in 2023 EverGlade Consulting had net income of $1.7 million. Dkt. 185 at ¶ 86. It is unclear whether that net income amount is after payment of the annuity payments, which presumably are business expenses deducted from gross revenue. No information has been

3

provided about EverGlade Consulting's net income in 2024 or 2025 year to date, nor has the total compensation paid by Consulting or any other Durian entity to the Jia-Sobotas since the fraudulent transfer been disclosed. Additionally, under the proposed settlement agreement the Durian entities are presumably responsible for making payments to the estate, but no information has been provided about the assets, liabilities, and income of the Durian entities. Further, Eric and Jerry Jia-Sobota are personally guaranteeing the payments, but no information concerning the Jia-Sobotas assets, liabilities, and income has been provided. The proposed settlement also includes a provision that the payment period is automatically extended one year if there is a 10% drop in EverGlade Consulting's revenue over three months, yet no information has been provided regarding EverGlade Consulting's historical monthly revenue; the agreement is backed by the collateral of the Durian entities, yet no information about what collateral (if any) those entities have has been disclosed.

8.      There are additional deficiencies in the proposed settlement agreement that BDO discusses herein and that BDO would expand upon if given additional time to draft its Objection. Debtor asks this Court to approve an incomplete settlement agreement with terms that BDO has not had a reasonable opportunity to evaluate and comment on because of documents withheld by entities and individuals getting the broadest releases imaginable. BDO has been grossly deprived of its due process rights to have sufficient time to formulate its objection to the incomplete settlement agreement, as BDO effectively had just one full business day to draft its Objection. Approving the incomplete settlement agreement would set a dangerous precedent for alleged fraudsters to escape liability on the cheap by effectively depriving creditors of their ability to object. The Court must reject the proposed settlement agreement, or at least continue the hearing to afford BDO due process.

4

## II.     BACKGROUND

9.      Debtor perpetrated a social media smear campaign against BDO from February 2021 to April 2021. *See BDO USA, LLP v. EverGlade Glob., Inc.*, No. N22C-12-063 KSM CCLD, 2023 WL 1371097 at *1-2 (Del. Super. Ct. Jan. 31, 2023) ("Sanctions Opinion") (attached hereto as Exhibit A). Eric Jia-Sobota (and later Jerry Jia-Sobota) destroyed every piece of evidence he could, including resetting all company laptops, wiping all browser history on every device he owned, deleting documents from the Debtor's cloud storage service, and even downloading and repeatedly running a file destroy application on his work laptop. *Id.* at *7. For Debtor's rampant spoliation and other bad faith discovery misconduct (such as admittedly lying under oath), Debtor was sanctioned more than $5.2 million by the Delaware Court. *BDO USA, LLP v. JSCo Enterprises, Inc.*, No. N22C-12-063 KSM CCLD, 2023 WL 5191146, at *1 (Del. Super. Ct. Aug. 8, 2023) (attached hereto as Exhibit B). Further, liability on all of BDO's claims was entered as a sanction. *Id.* After receiving relief from the automatic stay, a damages trial proceeded in May 2024 in the Delaware Court. BDO's damages experts established that BDO suffered $35 million in damages from the smear campaign and BDO further argued that its expert correctly calculated damages, but at a minimum BDO was entitled to $5 million in damages for its defamation per se claim, which does not require proof of special damages became damages are presumed. May 31, 2024 Transcript of Delaware Damages Hearing at 53:06-14 (attached hereto as Exhibit C). BDO expects the Delaware Court to issue its damages award in the next few months.

10.      On November 27, 2024, BDO filed an adversary complaint to establish that Debtor's spoliation and bad faith litigation conduct and tortious smear campaign caused willful and malicious injuries to BDO, and that BDO's claims arising from Debtor's discovery sanction and torts are nondischargeable under 11 U.S.C. § 1192(2). *See* Adversary Proceeding No. 24-

04087. Debtor filed a motion to dismiss BDO's complaint on January 27, 2025 (Doc. 13), and

BDO opposed Debtor's motion to dismiss (Doc. 14). The nondischargeability action is pending

before Judge Searcy, and there is a hearing set on the motion to dismiss scheduled for April 14,

2025. Doc. 15.

## III.   STANDARD

11.     A bankruptcy court may approve a compromise settlement of a debtor's claim "only

when the settlement is fair and equitable and in the best interest of the estate." *Matter of Foster

Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). The court "must compare the terms of the

compromise with the likely rewards of litigation." *Id.* "When considering a compromise

settlement, courts have applied various factors to ensure that the settlement is fair, equitable, and

in the interest of the estate and creditors. This circuit has applied a three-part test." *Id.* The Fifth

Circuit held that "the bankruptcy court must consider: (1) the probability of success in the

litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely

duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other

factors bearing on the wisdom of the compromise." *Id.*

12.     The Fifth Circuit noted that "[w]hile this Circuit has not elaborated on the other

factors bearing on the wisdom of the compromise, [it would] do so now." *Id.* The Fifth Circuit

held that two additional factors are the importance of creditors' views and whether the settlement

involves related parties. *Id.*

13.     The Fifth Circuit discussed at length the importance of creditors' view noting: "One

such factor [bearing on the wisdom of the compromise is] . . . the paramount interest of creditors

with proper deference to their reasonable views." *Id.* The Fifth Circuit emphasized that "in the

bankruptcy context, the interests of the creditors not the debtors are paramount." *Id.* "While the

desires of the creditors are not binding, a court should carefully consider the wishes of the majority

of the creditors." *Id.* A "bankruptcy court may not ignore creditors' overwhelming opposition to a

settlement" and instead a "bankruptcy court should consider the amount of creditor support for a

compromise settlement as a factor bearing on the wisdom of the compromise, as a way to show

deference to the reasonable views of the creditors." *Id.* at 918.

14.     "Another factor bearing on the wisdom of the compromise at hand is the extent to

which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."

*Id.* In *Foster Mortgage*, the litigation claim involved an allegedly fraudulent transfer between a

parent and subsidiary, and the Fifth Circuit held: "When a debtor subsidiary settles a claim it has

against a parent corporation without the participation of the creditors, a bankruptcy court should

carefully scrutinize the agreement." *Id.*

15.     The Fifth Circuit summarized the effect of these two factors as follows: "***The***

***court's scrutiny must be great when the settlement is between insiders and an overwhelming***

***majority of creditors in interest oppose such settlement of claims.***" *Id.* at 919 (emphasis added).

## IV.    ARGUMENT

### A.      <u>The proposed settlement agreement between related parties should not be approved over the emphatic objection of the sole non-insider creditor.</u>

16.     Completely absent from Debtor's Motion for Approval of the Settlement

Agreement is mention of the two factors that required denial of the proposed settlement in *Foster*

*Mortgage*: whether creditors overwhelmingly oppose the proposed settlement and whether the

settlement is between insiders. As explained by the Fifth Circuit, in these circumstances the

"concern is that the courts below gave no consideration to issues we find dispositive: that nearly

all creditors in interest opposed this settlement and that the settlement was reached between

insiders without the participation of the creditors. In our estimation, the court abused its discretion

by not showing proper deference to the views of the creditors." *Foster Mortgage*, 68 F.3d at 918.

Similarly here, Debtor offers not one word about the creditors' views. To be clear, BDO emphatically opposes the proposed settlement agreement for many reasons, including but not limited to that it is incomplete, it grossly undervalues the claims being released given the apparent scope of the releases being given, documents necessary to evaluate its material terms have not been disclosed, it contains a general release not tailored to the fraudulent transfer in issue, the payment period is materially uncertain, and the proposed settlement contains inaccurate warranties and representations. Reading the Debtor's Motion, however, one would have no idea that the Court should consider BDO's views (as the only non-insider creditor), nor that BDO vehemently opposes the proposed settlement agreement. The Fifth Circuit in *Foster Mortgage* noted "***we have found no precedent for a compromise actively opposed by the major creditors and affirmatively approved by none***," and Debtor has not pointed to any such authority. *Id.* (citing *Reiss v. Hagmann*, 881 F.2d 890, 892–893 (10th Cir.1989) (emphasis added)).

17.     Further absent from Debtor's Motion is the fact that the proposed settlement agreement is between related (and in reality, *identical*) parties. The proposed settlement agreement is between the Debtor's estate and "the Durian Parties," defined as "the Durian Foundation Trust, Durian International, LLC, Durian Fiduciary Services, LLC, EverGlade Consulting LLC, Eric Jia-Sobota and Jerry Jia-Sobota." Debtor's two owners are Eric Jia-Sobota and Jerry Jia-Sobota, and Debtor's only officer is Eric Jia-Sobota. The two trustees of the Durian Foundation Trust are Eric Jia-Sobota and Jerry Jia-Sobota, and putatively the only two beneficiaries of the Trust are Eric and Jerry Jia-Sobota. The only two members of Durian International, LLC are Eric and Jerry Jia-Sobota. The Durian Foundation Trust owns EverGlade Consulting. In short, behind every relevant entity on both sides of the settlement is Eric and Jerry Jia-Sobota, and no one else. Debtor's Motion

tries to glaze over that fact by noting that "Debtor's counsel was wholly uninvolved in the negotiations" (at ¶ 15(d)), but of course Debtor's counsel did not need to participate because Debtor's interest in the negotiations was ultimately represented by the party on the other side of the negotiations: the Durian Parties, all of whom are controlled by Eric and Jerry Jia-Sobota.

18.     Debtor's Motion notes that the negotiations were between the Trustee and the Durian Entities. Debtor may argue that fact distinguishes this case from *Foster Mortgage*, but that distinction is immaterial. The Trustee in fact diligently pursued a reasonable settlement for months. But BDO did not participate in the negotiations, other than occasionally being apprised of the progress by the Trustee. BDO did not participate at all in the settlement negotiations with the Durian Entities. Further, the Trustee is not a party to the settlement negotiations, so the proposed settlement agreement is nevertheless between insiders. The proposed settlement agreement is also not final but is instead an agreement to agree, as the Restructured Annuity Agreement is intended to be finalized at some undefined later point. There is no final agreement negotiated by genuinely adverse parties in a good faith arm's length negotiation, making the facts here materially similar to *Foster Mortgage*.

19.     Therefore, in circumstances strikingly similar to these, the Fifth Circuit vacated the settlement agreement and held: "The court below should have examined more carefully this deal between parent and child. This Court is not surprised that the creditors oppose the settlement between parent and child, the negotiation of which they were not a part." *Foster Mortage*, 68 F.3d at 918–19. Indeed, the parties on both sides of the transaction are clearly related and essentially identical; indeed, absent the fraudulent transfer, EverGlade Consulting was the subsidiary of Debtor, making the case truly on point with *Foster Mortgage*. *See id.* at 918 ("The bankruptcy court below made no findings on creditor opposition. We find this itself an abuse of discretion; the

judge failed to consider what in this case was ***nearly unanimous creditor opposition to the settlement between parent and child***." (emphasis added)).

20.     The "bankruptcy court must consider the paramount interest of the creditors and the nature of the negotiations as factors bearing on the wisdom of the compromise." *Id.* at 919. Approval of Debtor's proposed settlement agreement cannot be squared with careful consideration of the creditor's interest and the nature of the negotiations here, especially when BDO is forced to so hastily formulate its objection without necessary information. The Court must reject the proposed settlement.

### B.     The other *Foster Mortgage* factors weigh against approving the settlement.

21.     The other two *Foster Mortgage* factors are "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law [and] (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay." *Foster Mortgage*, 68 F.3d at 917.

22.     First, the probability of success is likely. Debtor's Motion argues that litigation would be "expensive and protracted," and that the results of the action would be "uncertain." Mot. at ¶ 15(a). Debtor offers nothing to substantiate these claims. By contrast, the Trustee concluded that "the Transfer most likely is subject to avoidance pursuant to 11 U.S.C. § 548" and that "The Debtor and E. Jia-Sobota took all the steps described here to hinder, delay, and defraud BDO during the pendency of the DC Litigation and Delaware Litigation." Dkt. 185 at ¶¶ 52, 67. The Trustee concluded both an actual and constructive fraudulent transfer occurred. The fraud was apparent. On the eve of a multimillion-dollar sanction in Delaware, Debtor transferred its primary asset (its operating business) to entities owned and controlled by Debtor's two owners. Some transfers were also made after the Delaware Court ordered default judgment and fee shifting on

10

January 31, 2023, but were purportedly retroactive to January 1, 2023. *See, e.g.*, Employment Agreement of Eric Jia-Sobota dated May 30, 2023 (attached hereto as Exhibit F). The estate also has claims relating to: (1) Eric Jia-Sobota's breach of his fiduciary duty to Debtor by engaging in the smear campaign that resulted in the Delaware litigation; and (2) Eric and Jerry Jia-Sobota's breaches of their fiduciary duties by rampantly spoliating evidence and engaging in bad faith discovery misconduct in Delaware. The proof of these claims has largely been adduced in the Delaware proceedings already, including detailed in a lengthy opinion by the Chancellor of the Delaware Chancery Court. While no litigation outcome can be certain, the claims here are highly meritorious and in part have already been litigated.

23.     Second, the basic nucleus of facts as described in the Trustee's report are not particularly complex, and BDO is willing to bear the cost of litigating the claims on behalf of the estate, significantly quelling any concerns about expense and inconvenience. As in *Foster Mortgage*, BDO is willing to bear the cost of litigating the fraudulent transfer claims and unrelated claims against the Durian Parties.[1] Litigating is thus virtually all upside for the estate, as BDO will pay the cost of litigating. In discussing the *Reiss* case from the Tenth Circuit, the Fifth Circuit in *Foster Mortgage* approvingly noted that "the Tenth Circuit vacated a settlement where there was only a single creditor, that creditor was able to cover the costs of litigation and would receive nothing without success in the lawsuit." *Foster Mortgage*, 68 F.3d at 918. That is likewise the case here, as BDO strenuously objects to the settlement and will cover the costs of litigation.

---

[1] BDO is willing to serve at its own expense as special counsel to the Trustee or to the estate to litigate these claims on behalf of the estate. BDO has learned of intervening case law since BDO first requested leave on behalf of the Trustee to bring the fraudulent transfer action that has held a Subchapter V Trustee cannot litigate fraudulent transfer claims on behalf of a debtor's estate, as that is beyond the scope of a trustee's duties identified in the bankruptcy code. *See In re Ghatanfard*, 666 B.R. 14, 26 (S.D.N.Y. Nov. 7, 2024). If the Court here believes that the Trustee does not have authority to litigate on behalf of the estate, BDO would request leave to serve as special litigation counsel to the estate or request leave to bring the claims on behalf of the estate, and in either circumstance with this Court's approval would proceed to litigate at its own expense.

24.     As detailed below, the potential recovery is likely multiples higher than the settlement amount. As noted by the Trustee, EverGlade Consulting's net income in 2023 alone was more than $1.7 million, yet the total annual payments under the proposed settlement are far lower than that. Also, if the fraudulent transfer claims were litigated, BDO would seek breach of fiduciary duty claims against the Jia-Sobotas and joint and several liability against all individuals that were subsequent transferees and/or beneficiaries of the fraudulent transfer. Joint and several liability would help to stymie the shell game that the Transferees have proven adept at. It is therefore worthwhile to litigate rather than settle for pennies on the dollar.

25.     While Debtor "assures" the Court that there will be a consistent revenue stream to the Debtor to pay its creditors (Mot. at ¶ 15(b)), that payment stream is anything but assured. The settlement is not structured in one sweeping lump sum payment upfront, but rather future monthly payments over years are merely promised based on a Restructured Annuity Agreement that does not exist. In fact, because the Restructured Annuity Agreement does not exist yet, it is not even known which party is responsible for the payments. LainFaulkner's report criticized the original annuity for the fact that "the entity responsible for making the annuity payments (Foundation) is not even the same entity that generates the cashflow (Consulting)."  Dkt. 185 at 11. The Restructured Annuity Agreement does not yet exist, but seemingly that problem has not been fixed as there is no evidence that EverGlade Consulting is the party responsible for making payments to the estate. Further, the settlement agreement provides for an extension of the annuity payment terms "[i]f EverGlade can demonstrate a revenue decline of 10% or more over a three-month period on a year-over-year basis." Neither Debtor nor any other party has provided any evidence that would allow BDO or the Court to assess how likely or unlikely such a revenue decline is based on past monthly revenue data. It also appears that the Durian Parties would be free to manipulate

12

monthly revenue—by deferring collections—and thereby triggering deferral. Moreover, there may

be unlimited revenue extensions, and BDO can do nothing but speculate about how likely the Plan

Trustee is to grant additional extensions. There is a near certainty of one extension, and potentially

many more. BDO will have no ability to stop further extensions because extensions are up to the

sole discretion of the Plan Trustee.

26.     Here, "[t]he relationship between [related parties] militates in this case against

allowing a settlement for considerably less than the creditors believe they are owed and are willing

to litigate for." *Foster Mortgage*, 68 F.3d at 918–19. Where the overwhelming creditor has

"opposed [Debtor's] settlement and [is] willing to cover their litigation costs," the proposed

settlement should be rejected. *Id.* at 918.

## C.     <u>By the Trustee's own criteria, the proposed settlement agreement should be rejected.</u>

27.     LainFaulkner found numerous flaws in the original annuity agreement that rendered

it of no "more than a nominal amount." Dkt. 185 at 35. In analyzing the terms of the annuity

agreement, LainFaulkner stated that "there are no protective measures" in place and added: "There

is nothing stopping Consulting from incurring non-market management compensation, incurring

additional debt for a debt/equity recapitalization, making excessive dividends/distributions and

leaving the Foundation without sufficient funds available to service the Annuity[.]" Dkt. 185 at

32. Every one of those critiques applies equally to the proposed settlement agreement. Under the

terms of the proposed settlement agreement and the non-existent Restructured Annuity Agreement,

there is no restriction on non-market management compensation, no restriction on incurring

additional debt, and no restriction on excessive dividends to insiders. The proposed settlement

agreement is barely better than the original annuity agreement, as determined by LainFaulkner's

own criteria. The proposed settlement agreement is not fair and equitable or in the best interests of the estate and the estate's creditors and must be rejected by this Court.

**D.** **The proposed settlement agreement is incomplete.**

28.    Debtor's filing mentions—but fails to include—the "Restructured Annuity Agreement" that is incorporated into the settlement agreement as "Exhibit A." *See* Dkt. 210 at 8-9. Exhibit A to the settlement agreement contains a placeholder stating: "To be provided." *Id.* at 14. Documents incorporated into a writing "must be in existence" to satisfy the statute of frauds. *Alattar v. Ganim*, 355 S.W.3d 1, 7 (Tex. App. 2010), *review granted, judgment rev'd*, No. 10-0592, 2011 WL 2517140 (Tex. June 24, 2011), *opinion withdrawn* (Mar. 30, 2012). Because the settlement agreement states that a Restructured Annuity Agreement "shall" be "execute[d]," and Exhibit A consists of a mere placeholder, it appears that the Restructured Annuity Agreement does not exist. The settlement agreement thus fails the statute of frauds, is not enforceable, and cannot be approved.

29.    Even assuming for argument's sake that the proposed settlement agreement satisfies the statute of frauds (it does not), the list of terms purportedly contained in the Restructured Annuity Agreement may not include *all* terms in the Restructured Annuity Agreement. Because the Restructured Annuity Agreement has not yet been drafted, Debtor and the Transferees—both controlled by the same individuals—could draft additional favorable annuity terms for themselves that would be incorporated into the already court-approved settlement agreement and would be binding.

**E.** **The proposed settlement amount does not reasonably compensate the estate for the value of the claims being released.**

30.    Debtor's proposed settlement states that the Restructured Annuity Balance is $5,000,000 and with a 7.5% interest rate over the putative 48-month term, the total settlement

14

payment with interest would be $5,802,936.47. By any metric, that is a woefully inadequate settlement amount for the extremely broad releases given to the Transferees in the proposed settlement agreement.

31.    The original annuity agreement between Debtor and Durian International had total payments of $9,658,283.20 over 8.9 years, though as detailed in the Trustee's report Durian International had complete discretion to defer payments for forty years. Dkt. 185 at ¶ 48. In the intervening two years, Durian International has presumably made payments totaling $2,260,834, meaning the outstanding balance on the annuity payments is $7,397,449.20. There is no explanation whatsoever for why the outstanding balance for the Restructured Annuity Agreement was reduced from $7,397,449.20 to $5,802,936.47.

32.    Further, the extraordinarily broad release gives away claims for no consideration. The fraudulent transfer claim is worth the net present value of $6,582,000 as of January 1, 2023. The estate has further claims for any proceeds of the fraud since the transfer. First, as noted in the Trustee's report, the estate has claims against Eric Jia-Sobota and Jerry Jia-Sobota for their flagrant breach of their fiduciary duties in effecting the fraudulent transfer to enrich themselves and plunder the estate. Dkt. 185 at ¶ 81. Second, the LainFaulkner report stated EverGlade Consulting had net income of more than $1.7 million in 2023, and the estate is entitled to that income as the proceeds of the Transferees' fraud. Third, putative severance payments totaling $900,000 were made to Andrew Stiles (fired by EverGlade Consulting because he was indicted and later convicted and imprisoned for securities fraud) and Daniel Paterson, even though they were at-will employees. Fourth, the egregious conduct here by the Transferees, including their breaches of their fiduciary duties, would likely warrant punitive damages, which could total millions of dollars. *See In re Arabella Petroleum Co., LLC*, 647 B.R. 851, 883 (Bankr. W.D. Tex. 2022) (holding that § 41.008

of the Texas Civil Practice and Remedies Code authorizes exemplary damages up to two times the amount of economic damages for breaches of fiduciary duties where a plaintiff can show by clear and convincing evidence that the fiduciary acted with fraud, malice, or gross negligence as specified in § 41.0003). Fifth, the estate has a claim for breach of fiduciary duty against Eric Jia-Sobota for perpetrating the smear campaign against BDO, which is likely worth millions of dollars. Sixth, the estate has a claim for breach of fiduciary duty against Eric Jia-Sobota and Jerry Jia-Sobota for spoliation and other discovery misconduct that led to the $5.3 million sanction award against Debtor. As shown by totaling these claims in the table below, these claims are worth at least $19 million and likely worth significantly more than that.

| Type of Damages/Damages Basis | Amount |
| --- | --- |
| Fraudulent transfer of Consulting | $6,582,000 (plus interest) |
| Net income of Consulting since transfer | $1,727,548 + (any net income from 2024 and 2025 YTD) |
| Severance to Paterson | $500,000 |
| Severance to Stiles | $400,000 |
| Unreasonable Compensation to Eric Jia-Sobota | TBD |
| Unreasonable Compensation to Jerry Jia-Sobota | TBD |
| Punitive Damages from Breach of Fiduciary Duty claims and Fraudulent Transfer claims | TBD |
| Breach of Fiduciary Duty Claims against Eric Jia-Sobota for smear campaign | At least $5,000,000 |
| Breach of Fiduciary Duty Claims against Eric Jia-Sobota and Jerry Jia-Sobota for spoliation | $5,236,972.77 + TBD |
| **Total** | **$19,418,972.77 + TBD** |

33.     Debtor does not even attempt to explain why it is settling its claims (the only real assets of the estate) for 25 cents on the dollar at most. Further, Debtor's strategy to try to escape spoliation sanctions in Delaware was to blame Eric Jia-Sobota for that conduct and try to distance itself from him. Sanctions Opinion at *1. It is inexplicable that Debtor blamed Eric Jia-Sobota

16

alone for the discovery misconduct yet now would give away a claim for breach of fiduciary duty based on his discovery misconduct for nothing. The proposed settlement amount grossly undervalues the assets of the estate and must be rejected.

**F.**     **The release given is unreasonably broad.**

34.     The release in the proposed settlement agreement releases claims never investigated by the Trustee and releases non-debtors that have given no consideration in exchange for the releases. These releases are contrary to law and require that the proposed settlement agreement be rejected. *See In re Ghatanfard*, 666 B.R. 14, 26 (S.D.N.Y. Nov. 7, 2024).

35.     The proposed settlement agreement would release all possible claims that Debtor has against all Transferees. That vastly exceeds the scope of the Trustee's investigation, which was limited to the fraudulent transfer of EverGlade Consulting to Durian International and breaches of fiduciary duties by Eric and Jerry Jia-Sobota related to that transfer. There is no reason and there is insufficient consideration for the sweeping releases of all Transferees. Most notably, the Trustee was not charged with investigating claims for (1) breach of fiduciary duty by Eric Jia-Sobota for conducting the smear campaign against BDO (for which Debtor has been held liable in Delaware); and (2) breaches of fiduciary duty by Eric Jia-Sobota and Jerry Jia-Sobota for intentionally spoliating evidence and other discovery misconduct (for which Debtor has been sanctioned nearly $5.3 million). The extremely broad proposed release is improper. The Transferees are once again trying to strip the Debtor of assets without proper compensation. The unconscionably broad general release demonstrates why the proposed settlement agreement must be rejected. At the very least, the above breach of fiduciary duty claims must excised from the release, as they are beyond the proper scope of the proposed settlement agreement of the fraudulent transfer claims and breaches arising therefrom, and no consideration is being given for them.

36.     Further, Andrew Stiles and Daniel Paterson, not parties to the proposed agreement, are providing no consideration, and yet are receiving complete releases. That is contrary to law and a sufficient basis for rejecting the proposed settlement agreement. *Tamez v. Sw. Motor Transp., Inc.*, 155 S.W.3d 564, 571 (Tex. App. 2004) ("In accordance with the general rules of contracts, consideration sufficient to support a release must consist of either a benefit to the releasor or a detriment to the person released.").

37.     At a minimum, the Court should make clear that the following estate claims are outside the scope of the proposed settlement: (1) breach of fiduciary duty by Eric Jia-Sobota for conducting the tortious defamatory campaign against BDO; (2) breach of fiduciary duty by Eric Jia-Sobota and Jerry Jia-Sobota for intentional spoliation of evidence and additional discovery misconduct; and (3) all claims against Daniel Paterson and Andrew Stiles.

### G.     **The proposed settlement agreement unreasonably provides potentially unlimited extensions.**

38.     The proposed settlement agreement fails to remedy the risk that the Transferees could defer all or a significant amount of payments to Debtor. The original annuity agreement states that the maturity dates of the monthly annuity payments are in 2062 and 2063; in other words, any missed payments to the Debtor are expressly deferred until 2062 and 2063, forty years from now. *See* Private Annuity Agreement dated January 1, 2023, at ¶ 3, pp. 7-19 (attached hereto as Exhibit D). But rather than remedying this risk, the proposed settlement agreement provides for potentially unlimited payment extensions. The proposed settlement agreement gives Debtor an "automatic" payment extension "[i]f EverGlade can demonstrate a revenue decline of 10% or more over a three-month period on a year-over-year basis." Dkt. 211 at 8. As an initial matter, BDO has received no supporting documents showing EverGlade Consulting's finances, and is therefore unable to assess how likely a 10% decline in revenue over a three-month period is. And because

18

both Debtor and the Durian entities are controlled by the same insiders—the Jia-Sobotas—they have every incentive to find such a decline is "demonstrated."

**H.**   **BDO cannot assess whether the collateral commitments are meaningful.**

39.    The Restructured Annuity Agreement is putatively collateralized by the assets of EverGlade Consulting, Durian International, and the Durian Foundation Trust. Dkt. 210 at 8. Why Durian Fiduciary, LLC is excluded is unexplained. As discussed above, BDO has not seen the financial documents of these entities and cannot meaningfully value the collateral. Moreover, these three entities are all controlled by the Jia-Sobotas and were created as part of a shell game to avoid paying BDO. *See* Dkt. 185 at ¶¶ 58-61. Eric Jia-Sobota transferred his entire consulting business from Debtor into EverGlade Consulting, and then transferred Consulting to Durian International, as part of that shell game. *See* Dkt. 185 at ¶ 15. No terms in the nonexistent Restructured Annuity Agreement prevent the Jia-Sobotas from revisiting their playbook and transferring the business into yet another entity controlled by them to avoid paying BDO.

**I.**   **The Third Representation and Warranty is wrong.**

40.    The proposed settlement agreement contains a Representations and Warranties section that states: "There are no pending or threatened claims, actions, or proceedings that would materially adversely affect their ability to perform their obligations under this Agreement." That is untrue.

41.    BDO is currently litigating against Eric Jia-Sobota in the D.C. Court of Appeals concerning his breaches of his BDO partnership agreement. That litigation is likely to be either compelled to arbitration or sent back to the D.C. Superior Court for merits litigation in the next several months. While the outcome is uncertain, BDO has alleged Jia-Sobota attempted to steal the clients and employees of a business unit worth $40 million dollars, meaning BDO's claims

19

could result in millions of dollars of liability. Further, BDO brought suit in New York Supreme

Court against Andrew Stiles and another individual named Stephen Morris that helped Jia-Sobota

solicit BDO clients for Debtor, and the Supreme Court found that that Morris successfully solicited

BDO clients and prospective BDO clients to terminate their relationships with BDO. *See* Order,

*BDO USA, P.C. v. Stephen Morris & James Andrew Stiles*, Case No. 652352 (N.Y. Sup. Ct. Sep.

12, 2024) (attached hereto as Exhibit E). While not dispositive, it is likely that an arbitration panel

or the D.C. Superior Court will come to a conclusion similar to the New York Supreme Court.

Accordingly, the personal guarantee of Eric Jia-Sobota (and thus his spouse Jerry Jia-Sobota) may

turn out to be worth little if Jia-Sobota is found liable and ordered to pay BDO significant damages.

## <u>CONCLUSION</u>

For the foregoing reasons, Debtor's Motion should be denied.


Dated: March 24, 2025                    Respectfully submitted,

                                         **McDERMOTT WILL & EMERY LLP**

                                         By:  */s/ Charles R. Gibbs*
                                         Charles R. Gibbs
                                         (Texas State Bar No. 07846300)
                                         Eric C. Seitz
                                         (Texas State Bar No. 24067863)
                                         2501 N. Harwood Street, Suite 1900
                                         Dallas, Texas 75201
                                         Telephone: (214) 295-8000
                                         crgibbs@mwe.com
                                         eseitz@mwe.com

                                         *ATTORNEYS FOR BDO USA, P.C*

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned counsel hereby certifies that on this 21st day of March 2025, he caused a true and correct copy of the foregoing *BDO USA, P.C.'s Objection to Debtor's Expedited Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Entry of Order Approving Settlement Agreement* to be served on all parties listed below in the manner indicated herein.

                  */s/ Charles R. Gibbs*
                  Charles R. Gibbs (Texas Bar No. 07846300)
                  Eric C. Seitz (Texas State Bar No. 24067863)
                  **MCDERMOTT WILL & EMERY LLP**
                  2501 North Harwood Street, Suite 1900
                  Dallas, Texas 75201
                  crgibbs@mwe.com
                  eseitz@mwe.com

                  *Counsel for BDO USA, P.C.*

### <u>Via CM/ECF</u>

Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road
Suite 850
Dallas, Texas 75251
E-mail: hspector@spectorcox.com

*Counsel for the Debtor*

Office of the United States Trustee
John M. Vardeman
110 N. College Street, Suite 300
Tyler, Texas 75702
E-mail: john.m.vardeman@usdoj.gov

Jason Canales
Canales PLLC
125 Park Avenue, 25th Floor
New York, New York 10017
Email: jason@canalespllc.com

*Counsel for Eric Jia-Sobota*

21

James G. McMillan, III
Halloran Farkas & Kittila LLP
5801 Kennett Pike, Suite C/D
Wilmington, DE 19807
E-mail: jm@hfk.law

*Special Counsel for the Debtor*

### Via CM/ECF and First Class Mail

Brad W. Odell
Mullin Hoard & Brown, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408
E-mail: bodell@mhba.com; memert@mhba.com; mreynolds@mhba.com;
mjaramillo@mhba.com

*Subchapter V Trustee*