**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **JSCo Enterprises, Inc.,** | § | **Case Number 23-42151** |
| | § | **(Chapter 11)** |
| **Debtor.** | § | |

**MEMORANDUM OPINION AND ORDER**
**OVERRULING OBJECTIONS TO THE FIRST AMENDED PLAN**

JSCo Enterprises, Inc. ("**JSCo**" or the "**Debtor**") seeks confirmation of its First Amended Plan of Liquidation under Subchapter V of Chapter 11 of the Bankruptcy Code. BDO USA, P.C. ("**BDO**"), the Debtor's largest unsecured creditor, objects to confirmation on multiple grounds under 11 U.S.C. §§ 1129 and 1191. The Court conducted an evidentiary hearing to consider confirmation, and, for the following reasons, concludes that BDO's objections should be overruled and, further, that the First Amended Plan satisfies the applicable confirmation requirements of the Bankruptcy Code subject to certain clarifications.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

BDO is a national public accounting, tax, and advisory firm. Eric Jia-Sobota previously served as the national leader of one of BDO's practice groups. While employed at BDO, Eric Jia-Sobota formed a business that became JSCo. His husband, Jerry Jia-Sobota, later became JSCo's majority shareholder and served as its president. Brad Odell served as the Subchapter V Trustee in this bankruptcy case. During the case, the Court expanded Trustee Odell's statutory duties to investigate the prepetition transactions that are central to the confirmation dispute.

**B. The Delaware Litigation**

In May 2020, BDO initiated arbitration proceedings and filed a related action for injunctive relief in aid of arbitration against Eric Jia-Sobota and EverGlade Global, Inc. n/k/a JSCo in the Superior Court of the District of Columbia, alleging that Eric Jia-Sobota had breached the BDO partnership agreement. BDO became the target of a smear campaign after settlement negotiations failed. In March 2021, BDO filed another suit in the Delaware Court of Chancery against JSCo seeking injunctive relief and damages in connection with the smear campaign. As a remedy for JSCo's spoilation of evidence and related litigation misconduct during the Delaware proceedings, the court entered a default judgment in BDO's favor and granted BDO attorneys' fees and expenses in an amount to be determined. *See BDO USA, LLP v. EverGlade Global, Inc.,* 2023 WL 1371097 (Del. Super. Ct. Jan. 31, 2023). The Delaware court later awarded BDO $5,236,972.77 in attorneys' fees. *BDO USA, LLP v. JSCo Enterprises, Inc.*, 2023 WL 5191146 (Del. Super. Ct. Aug. 8, 2023). The Court ordered JSCo to pay BDO by August 22, 2023. JSCo failed to do so, and BDO filed motions for contempt in August and October 2023.

The DC and Delaware litigation remained pending when JSCo filed for bankruptcy protection. In March 2025, the Delaware court concluded a damages hearing. The Delaware court later issued a written ruling awarding BDO damages of $1,920,000 plus post-judgment interest at the statutory rate. *BDO USA, P.C. v. JSCo Enters., Inc.*, 2025 WL 2390920 (Del. Super. Ct. Aug. 14, 2025). Thus, BDO's total liquidated claim against JSCo is approximately $7.1 million (inclusive of the previously awarded $5.2 million).

**C. The EverGlade Transaction and Formation of JSCo**

Eric Jia-Sobota formed A2Z Associates, Inc. ("**A2Z**") as a Delaware corporation in February 2020. In June 2020, A2Z changed its name to EverGlade Global, Inc. ("**EverGlade**

**Global**”). Two months later, Eric Jia-Sobota formed EverGlade Consulting, LLC (“**Everglade Consulting**”), a Delaware limited liability company. EverGlade Global was the sole member and manager of EverGlade Consulting, through which a consulting business was conducted. In August 2021, Eric Jia-Sobota transferred 51% of EverGlade Global’s common stock to his partner, Jerry Jia-Sobota.

While the BDO litigation was pending, the EverGlade entities underwent a series of changes in the organizational structure and ownership. In November 2022, EverGlade Global converted from a Delaware corporation to a Texas corporation. Similarly, in December 2022, EverGlade Consulting converted from a Delaware limited liability company to a Texas limited liability company.

In December 2022, the Durian Foundation Trust (the “**Foundation**”) was formed and settled by EverGlade Global. On December 13, 2022, EverGlade Global entered into a purchase agreement with the Foundation that altered the ownership structure of the consulting business. Before the transaction, EverGlade Global owned 100% of Everglade Consulting, which operated the consulting business. Under the purchase agreement, EverGlade Global transferred its membership interests in EverGlade Consulting to the Foundation for a stated purchase price of $6,582,000. Rather than paying in cash, the Foundation executed a private annuity agreement in favor of EverGlade Global that required fixed monthly installments over nine years.

Thus, following the transaction, EverGlade Global no longer owned EverGlade Consulting. Instead, its only significant asset was the Foundation’s obligation to make payments under the private annuity agreement. In May 2023, EverGlade Global changed its name to JSCo Enterprises, Inc.

BDO and JSCo disagree about the significance of that transaction. BDO contends the transfer was fraudulent and, as such, improperly removed substantial value from JSCo's bankruptcy estate. JSCo contends the annuity provided reasonably equivalent value and represented an appropriate restructuring of the business. Because the transaction involved JSCo's principal asset, it became the central factual issue in this bankruptcy case.

**D. The Bankruptcy Case**

JSCo filed this Chapter 11 case on November 9, 2023, and elected treatment under Subchapter V. Rather than immediately litigate its objections to the Debtor's proposed treatment of creditors and the prepetition transfer of JSCo's membership interest in EverGlade Consulting, BDO asked the Court to expand Trustee Odell's duties to investigate the EverGlade transaction and determine whether the estate possessed claims arising from that transfer. On April 26, 2024, BDO filed its motion to expand the Trustee's duties. On July 19, 2024, the Court entered an agreed order granting that motion in part and authorizing Trustee Odell to investigate the transfer of EverGlade Consulting.

**E. Trustee Odell's Investigation and the Settlement**

After conducting the investigation authorized by the Court, Trustee Odell submitted a written report addressing the EverGlade transaction and related matters. Trustee Odell determined that the EverGlade transaction was likely actually and constructively fraudulent. Although he determined that the stated purchase price was reasonable, he concluded that the consideration provided in exchange was illusory. Rather than pursue litigation, he negotiated a settlement. The settlement materially changed the economic structure of the original transaction by modifying the annuity arrangement and adding additional protections for the estate, including additional collateral and personal guaranties. The restructured annuity is payable to JSCo over 48 months.

BDO objected to the proposed settlement. After a hearing, the Court overruled BDO's objection and approved the settlement under Bankruptcy Rule 9019. BDO has appealed the order approving the settlement, and its appeal remains pending.

**F. The First Amended Plan**

Following approval of the settlement, the Debtor filed its First Amended Plan of Liquidation. The First Amended Plan is a liquidating plan that implements the settlement. The duration of the Plan's distribution period is tied to the 48-month payment schedule established by the settlement.

On the effective date, the Subchapter V Trustee becomes the "Plan Trustee," and the Debtor becomes the "Liquidating Debtor." Subject to the settlement, all property of the estate, including retained causes of action, vests in the Liquidating Debtor. The Plan Trustee receives the Debtor's cash on hand and is charged with administering the Plan, receiving proceeds of causes of action, accounting for amounts paid under the settlement, establishing necessary reserves, paying administrative expenses, enforcing the Liquidating Debtor's rights under the settlement, and making distributions to holders of allowed claims.

The Plan creates two classes of claims. Class 1 consists of Allowed Secured Claims and is unimpaired. Class 2 consists of Allowed General Unsecured Claims and is impaired. Holders of Allowed Secured Claims are to receive payment in full in accordance with applicable nonbankruptcy law. In addition, any administrative claims and other priority claims will be paid in cash on the effective date, subject to the procedures established by the Plan.

The Plan becomes effective fifteen days after entry of a confirmation order (unless the confirmation order is stayed). Each holder of an Allowed Class 2 Claim receives, in full satisfaction of its claim, its pro rata share of the Debtor's "Disposable Income" earned during the immediately

preceding calendar quarter. Under § 4.1(f) of the First Amended Plan, quarterly distributions begin on the first quarterly disbursement date occurring at least thirty days after the effective date and continue through the quarter following the final payment required by the settlement.

BDO's claim is treated in Class 2. To the extent BDO's claim remains disputed, no distribution will be made directly to BDO until the claim is allowed. Instead, the Plan Trustee must reserve the distributions that BDO would have received if its claim had been allowed. If the claim is ultimately allowed, the reserved amounts are distributed in accordance with the Plan. The Plan also authorizes the Plan Trustee, subject to Court approval, to settle BDO's claims if the settlement results in final resolution of the claims arising from the BDO litigation.

Eric Jia-Sobota remains the sole officer and director of the Liquidating Debtor, but he will receive no compensation from it. After all payments required by the Plan have been made, the Liquidating Debtor is to wind down and dissolve.

**G. BDO's Objections to the First Amended Plan**

BDO is the Debtor's largest unsecured creditor and voted against the Plan. BDO also objects to confirmation, asserting that the amended Plan fails to satisfy multiple confirmation requirements under §§ 1129 and 1191 of the Bankruptcy Code. The Court conducted an evidentiary hearing on June 16 and 27, 2025 during which the parties presented testimony and introduced numerous exhibits. The parties presented their respective closing arguments in comprehensive post-hearing briefing.

In its objection to confirmation of the Plan, BDO advances numerous factual and legal arguments in support of its contention that the Plan fails to satisfy particular confirmation requirements. BDO's objections generally present five overarching issues. First, whether the Plan was proposed in good faith as required by § 1129(a)(3) of the Bankruptcy Code. Second, whether

the Plan is feasible as required by § 1129(a)(11). Third, whether the Plan is fair and equitable under § 1191(b). Fourth, whether the Plan satisfies the best interest of creditors test under § 1129(a)(7). And finally, whether any remaining objections require denial of confirmation or clarification in the confirmation order. The Court addresses these issues in turn.

## II. DISCUSSION

Confirmation of a Chapter 11 plan in a Subchapter V case is governed by 11 U.S.C. §§ 1129 and 1191. The Debtor bears the burden of proving, by a preponderance of the evidence, that the Plan satisfies the applicable confirmation requirements. Because BDO's class has not accepted the Plan, the Debtor must establish not only that the Plan satisfies the applicable requirements of § 1129(a), but also that the plan satisfies the additional requirements for confirmation under § 1191(b). Specifically, as discussed more fully below, the Plan must not discriminate unfairly and must be fair and equitable with respect to each impaired, nonaccepting class. In the Subchapter V context, the fair-and-equitable requirement includes the additional requirements set forth in § 1191(c), including requirements relating to the Debtor's projected disposable income and ability to make the payments required by the Plan.

### A. The Debtor Is Eligible for Subchapter V.

Before turning to the requirements for confirmation, the Court addresses BDO's threshold contention that JSCo was never eligible to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code. When JSCo filed bankruptcy, § 1182(1)(A) of the Bankruptcy Code limited Subchapter V eligibility to a qualifying debtor with aggregate noncontingent liquidated secured and unsecured debts of not more than $7,500,000, excluding debts owed to affiliates or insiders. At least 50% of those debts were required to arise from the debtor's commercial or business activities. 11 U.S.C. § 1182(1)(A). JSCo bears the burden of establishing its eligibility to proceed

under Subchapter V. *See, e.g., In re Ikalowych*, 629 B.R. 261, 275 (Bankr. D. Colo. 2021); *In re Carter*, 2023 WL 9103614, *2 (Bankr. N.D. Ga. Dec. 13, 2023).

BDO argues that JSCo was never eligible for Subchapter V because less than 50% of its noncontingent liquidated debt arose from its commercial or business activities. Its argument turns principally on the $5.236 million attorneys' fee award. According to BDO, that debt arose from litigation misconduct rather than from JSCo's commercial or business activities and, therefore, cannot be counted toward the 50% threshold.

The Court begins with the statutory language. *In re Ikalowych*, 629 B.R. at 276. The term business or commercial activities has been broadly construed. *In re Robinson*, 2023 WL 2975630, *3 (Bankr. S.D. Miss. April 17, 2023). "Business activities" may consist of "the carrying out of a series of similar acts for the purpose of realizing a pecuniary benefit, or otherwise accomplishing a goal." *In re Ellingsworth Residential Cmty. Ass'n, Inc.*, 125 F.4th 1365, 1379 (11th Cir. 2025) (quoting *Doing Business*, *Black's Law Dictionary* (11th ed. 2019)); *In re Wilson*, 666 B.R. 828, 836–37 (Bankr. M.D. Ga. 2024).

Under that broad construction, JSCo's debt to BDO arose from JSCo's commercial or business activities. The fact that the debt was imposed as a litigation sanction does not sever it from the commercial activity that gave rise to the litigation. Section 1182(1)(A) does not limit qualifying debts to contractual obligations, trade debt, or liabilities incurred in the Debtor's day-to-day operations. Rather, it asks more broadly whether the debts arose from the Debtor's "commercial or business activities." A judgment or sanction arising from litigation concerning the Debtor's commercial activities falls within that language. Accordingly, the $5.236 million spoliation fee award is properly included in determining whether at least 50% of JSCo's qualifying debt arose from its commercial or business activities.

**B. The Debtor's Plan Contains Adequate Disclosures.**

BDO raises a second threshold objection based on the information included in the Plan. BDO contends that the Plan fails to satisfy § 1190(1)(A) because its brief history of the Debtor's business inadequately describes the BDO litigation, spoliation sanctions, and the EverGlade transaction.

As opposed to the traditional Chapter 11 case, a Subchapter V case generally does not require a separate disclosure statement. Under § 1190 of the Bankruptcy Code, Subchapter V plans must include "a brief history of the business operations of the debtor," a "liquidation analysis," and "projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization" and a plan must "provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." *See* 11 U.S.C. § 1190(1)-(2). The Debtor's Plan complies with all these requirements. A disclosure statement with the detailed information BDO requests is not required. *See, e.g., In re Ellingsworth Residential Cmty. Ass'n, Inc.*, 2021 WL 12324962, at *2 (M.D. Fla. Aug. 19, 2021), *aff'd,* 125 F.4th 1365 (11th Cir. 2025).

**C. The Debtor Has Established That the First Amended Plan Was Proposed in Good Faith.**

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Good faith should be evaluated 'in light of the totality of the circumstances surrounding establishment of [the] plan,' mindful of the purposes underlying the Bankruptcy Code." *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). The Fifth Circuit has held that the plan must be proposed with a legitimate and honest purpose of reorganizing and with a reasonable hope of success. *In re Sun Country*, 764 F.2d 406, 408 (5th Cir.

1985). Additionally, "[t]o be proposed in good faith, a plan must fairly achieve a result consistent with the [Bankruptcy Code]." *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

BDO contends that the Plan was not proposed in good faith for several reasons. BDO argues that the Debtor's prepetition restructuring placed valuable assets beyond the reach of creditors, that the bankruptcy case was filed to preserve that restructuring, and that the settlement brokered by Trustee Odell and the First Amended Plan further that objective. BDO also relies on alleged deficiencies in the Debtor's financial projections and alleged false or inconsistent testimony concerning the Debtor's ability to make the payments required by the Plan as further evidence of bad faith.[1]

**1. The Prepetition Restructuring**

BDO's concerns about the Debtor's prepetition restructuring prompted the Court to expand Trustee Odell's duties so that he could independently investigate the challenged transactions and evaluate potential claims on behalf of the estate. The Trustee conducted that investigation over several months and concluded that the estate possessed potential fraudulent transfer claims arising from the 2022 transfer of the Debtor's membership interests in EverGlade Consulting. Rather than immediately commence litigation, however, the Trustee negotiated a settlement with the Debtor, the Durian entities, and the Jia-Sobotas. The Court approved that settlement after an evidentiary hearing, concluding that it was the product of arm's-length negotiations, was fair and equitable, and afforded the estate a greater likelihood of providing a dividend to creditors than continued litigation.

[1] Those allegations overlap with BDO's separate objections concerning the Plan's feasibility and the Debtor's ability to make the payments required by the Plan, and the Court addresses them here only to the extent they relate to good faith.

BDO continues to challenge the settlement and the conclusions underlying it in an appeal to the District Court. Unless the Bankruptcy Rule 9019 order is reversed, however, the settlement remains part of the record on which confirmation must be decided. The Court will not disregard its prior findings or assume, contrary to those findings, that continued litigation would produce a superior result for the estate. Thus, the question before the Court is whether the First Amended Plan, viewed in light of the entire confirmation record, was proposed in good faith. The record establishes that it was.

**2. BDO's Allegations Concerning the Confirmation Process**

BDO's good faith objection is not limited to the prepetition restructuring. It also challenges the Debtor's conduct during the confirmation process, principally what BDO describes as Eric Jia-Sobota's inaccurate or inconsistent testimony. Specifically, BDO contends that the Debtor overstated projected revenues, understated expenses, failed to disclose the effect of the receivable financing it received from Breakout Capital, and overstated the value of the accounts receivable supporting the settlement. BDO further contends that Eric Jia-Sobota offered inconsistent testimony concerning whether the Debtor received legal advice in connection with the prepetition transfer of its membership interest in EverGlade Consulting and concerning errors in the financial projections.

BDO's allegations are serious. With respect to EverGlade's projected expenses, BDO established that the cash-flow projections omitted approximately $20,000 per month attributable to the interest component of the Breakout Capital payments. Eric Jia-Sobota acknowledged the omission at the confirmation hearing and testified that it was a mistake. He also testified that the Trustee's financial advisor had been made aware of the error. BDO argues that those explanations

are themselves inconsistent and that the omission was intended to make EverGlade's projected cash flow appear stronger than it was.

BDO likewise established that the projections presented at confirmation continued to include projected revenue from a client named GeoVax even though EverGlade had lost that client. At the same time, JSCo had updated the projections to include revenue from newly acquired clients. BDO contends that selectively adding new revenue without removing revenue known to have been lost materially overstated EverGlade's ability to fund the restructured annuity payments.

BDO also challenges the representations concerning the accounts receivable securing the restructured annuity. The evidence showed that EverGlade had ceased factoring its receivables with Breakout Capital and therefore owned those receivables, but the loan documents with Breakout Capital showed that it held a priority security interest in receivables. BDO therefore argues that the Debtor created the misleading impression that the receivables constituted meaningful unencumbered collateral when, in BDO's view, they were fully pledged to Breakout.

Finally, BDO points to Eric Jia-Sobota's testimony concerning legal advice received in connection with the prepetition transfer of JSCo's membership interest in EverGlade Consulting. BDO contends that his deposition testimony that the Debtor had counsel, received legal advice, and followed that advice cannot be reconciled with his later confirmation testimony concerning the absence of legal assistance with the transaction. BDO argues that this change in testimony was calculated to eliminate a potential malpractice claim after the settlement had released claims against the Jia-Sobotas.

The Court does not minimize these discrepancies. They bear directly on the reliability of the Debtor's financial evidence and, as discussed below, on whether the Debtor has established that the Plan can be performed according to its terms. But the Court is not persuaded that the

preponderance of the evidence supports BDO's further inference that the inaccuracies and inconsistencies were part of an intentional effort to deceive Trustee Odell or the Court in order to obtain confirmation. Viewed in the context of the entire confirmation record, the Court does not find that the evidentiary discrepancies identified by BDO establish that the Plan was proposed with an improper purpose or through a process inconsistent with the purposes of Chapter 11. Accordingly, the Court is not persuaded that the matters identified by BDO establish a lack of good faith under § 1129(a)(3) of the Bankruptcy Code.

**3. The Filing of the Bankruptcy Case**

BDO's remaining good-faith argument focuses on the bankruptcy filing itself. It contends that the bankruptcy case was part of an effort to place the Debtor's operating business beyond BDO's reach. BDO emphasizes that, by the petition date, JSCo no longer operated the consulting business, had no employees or customers, and held principally the right to receive payments under the annuity created by the prepetition transfer of its membership interest in EverGlade Consulting. BDO further argues that the bankruptcy filing followed the Delaware litigation that produced its substantial claim and that the Jia-Sobotas continued to control the operating business that had been transferred away from the Debtor. In BDO's view, those circumstances demonstrate that the bankruptcy case was commenced not to reorganize or maximize value for creditors, but to preserve the effects of the prepetition restructuring and delay BDO's collection efforts.

Those facts, however, do not end the good faith inquiry. The filing of this case did not simply freeze the prepetition structure in place. The Court expanded the Trustee Odell's duties to investigate the transfer of EverGlade Consulting. The Trustee conducted that investigation over several months and concluded that the estate possessed potential avoidance claims arising from the transaction. The investigation then led to settlement negotiations among the Trustee, the

Debtor, the Jia-Sobotas, and the transferee, and ultimately to a materially revised arrangement that was presented to the Court and approved after an evidentiary hearing.

The resulting settlement did more than preserve the original annuity. As discussed above, it altered the economic terms of the prepetition transaction and added protections for the estate. The First Amended Plan, in turn, incorporates that Court-approved resolution and provides the mechanism for administering the resulting rights and distributing value to creditors. Whatever the Debtor's condition or motives at the instant of filing, the record does not support BDO's contention that the bankruptcy case served only as a device to shield the operating business from creditors.

The record reflects that JSCO's bankruptcy case provided a forum for an independent fiduciary to investigate the challenged transfer, for potential estate claims to be evaluated and compromised under Bankruptcy Rule 9019, and for the resulting value to be administered through a court-supervised liquidation plan. Having considered the testimony, exhibits, the Trustee's investigation, the approved settlement, the terms of the First Amended Plan, and the parties' written closing arguments, the Court concludes that the Debtor has established, by a preponderance of the evidence, that the First Amended Plan was proposed in good faith and not by any means forbidden by law. Accordingly, the Debtor has satisfied § 1129(a)(3) of the Bankruptcy Code.

**D. The Plan Is Feasible.**

The same financial evidence that BDO cites as evidence of bad faith also underlies its objection that the Plan fails the "feasibility test" of § 1129(a)(11). Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that confirmation is not likely to be followed by liquidation or the need for further financial reorganization unless such liquidation or reorganization is proposed by the Plan. 11 U.S.C. § 1129(a)(11). Because the First Amended Plan is a plan of liquidation, the relevant inquiry is whether the Debtor has demonstrated a reasonable likelihood

that the Plan can be implemented according to its terms. *See e.g.*, *In re Heritage Org., L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007).

BDO contends that the Plan is not feasible for several reasons. BDO argues that the Plan depends upon speculative future events, relies upon funding from financially distressed non-debtor entities, and projects disposable income that is unsupported by the evidence. BDO also questions whether the Plan will generate sufficient funds to make the promised distributions to creditors.

Feasibility does not require certainty. Section 1129(a)(1) of the Bankruptcy Code requires only a reasonable assurance that the Plan can be performed. *See, e.g., In re Adelphia Bus. Solutions, Inc.,* 341 B.R. 415, 421–22 (Bankr. S.D.N.Y. 2003) (finding that "[i]n making determinations as to feasibility, ... a bankruptcy court does not need to know to a certainty, or even a substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success"). Every liquidation plan depends upon future events, including the liquidation of assets, the resolution of claims, and the administration of the estate. The existence of some uncertainty does not render a liquidation plan infeasible.

The evidence presented at the confirmation hearing demonstrates that the First Amended Plan identifies the assets to be administered, the sources of funding, the claims to be resolved, and the mechanism for making distributions to creditors. The Court recognizes that the Debtor's ability to perform depends upon payments under the restructured annuity agreement and that BDO identified legitimate concerns regarding the financial condition of the entities responsible for funding those payments. In particular, BDO points to errors in EverGlade's financial projections, anticipated negative cash flow, the absence of substantial cash reserves, and evidence concerning EverGlade's cash position at the time of the confirmation hearing.

Those concerns do not, however, establish that the Plan lacks a reasonable likelihood of success. EverGlade has operated continuously for approximately five years and had not missed an annuity payment during the approximately two years preceding the confirmation hearing. It maintains an ongoing working-capital line of credit and has been reducing its reliance on factoring, thereby reducing its financing costs. Although the projections reflect uncertainty concerning EverGlade's future cash flow, feasibility does not require the Debtor to establish that every future payment is certain. The historical payment record, EverGlade's continued operations, and its access to working capital provide reasonable assurance that the payment stream on which the Plan depends will continue.

The Court also considers the structure of the settlement and the Plan. The settlement replaced the former unsecured annuity obligation with a shorter payment stream supported by collateral and personal guaranties, and the Plan places administration and enforcement of those obligations in the hands of the Plan Trustee. The Plan also incorporates the Bankruptcy Rule 9019 settlement previously approved by the Court, eliminating litigation that otherwise could have delayed distributions and increased administrative expenses. Considering the confirmation record, the Court finds that the risks identified by BDO do not make successful implementation of the Plan unlikely. The Debtor has therefore satisfied § 1129(a)(11).

**E. The Plan Is Fair and Equitable.**

Because Class 2 did not accept the First Amended Plan, the Debtor is seeking confirmation under § 1191(b). Section 1191(b) governs confirmation of a Subchapter V plan proceeding under cram down, which allows a court to confirm a plan over the objection Class 2 if (i) the plan meets the confirmation requirements of § 1129(a), other than paragraphs (8), (10), and (15); (ii) the plan

does not discriminate unfairly against any impaired, non-accepting class, and (iii) the plan is fair and equitable regarding each class of impaired claims or interests that has rejected the plan.

The "fair and equitable" test for unsecured creditors in a Subchapter V plan is set forth in § 1191(c) and has three requirements. First, a plan is fair and equitable as to unsecured creditors if, as of the effective date, the plan provides that (a) all of the debtor's projected disposable income for a three-to-five-year period fixed by the court will be applied to make payments under the plan, or (b) the value of the property to be distributed under the plan during the three-to-five-year period is not less than the projected disposable income of the debtor. 11 U.S.C. § 1191(c)(3)(A) and (B). Second, the plan must be feasible. 11 U.S.C. § 1191(c)(3). Whereas § 1129(a)(11) requires only that confirmation is not likely to be followed by liquidation or the need for further reorganization unless the plan proposes it, the feasibility test under § 1191(c)(3) requires that the debtor can realistically carry out its plan, meaning that the debtor will be able to make all payments or there is a reasonable likelihood that the debtor will be able to make all payments. Third, if there is only a reasonable likelihood that the debtor will be able to make all payments, the plan must provide appropriate remedies to protect the holders of claims or interests if the payments are not made. 11 U.S.C. § 1191(c)(3)(B)(ii).

In this case, the First Amended Plan does not expressly identify an applicable commitment period. It does, however, incorporate the statutory definition of "disposable income" in § 1191(d) and require holders of Allowed Class 2 Claims to receive their pro rata share of the Debtor's disposable income each quarter. The Plan provides for payments to begin after the effective date and continue through the quarter immediately following the final payment under the settlement. The Plan further provides that the Liquidating Debtor will wind down and dissolve after all payments due under the Plan have been made.

BDO does not object to the length of the commitment period or argue that the First Amended Plan discriminates unfairly. Instead, it challenges the Debtor's calculation of projected disposable income and, relatedly, the Debtor's ability to payments provided for under the Plan. BDO argues that the Debtor's projections assume receipt of the restructured annuity payments under the settlement while overstating the financial ability of the Durian entities to make those payments and understating expenses, including anticipated litigation expenses, that will reduce the Debtor's disposable income. According to BDO, the resulting projections materially overstate the funds that will be available for distribution to Class 2.

BDO's primary objection concerns whether JSCo will actually receive the anticipated annuity income. BDO's challenge under § 1191(c)(3) substantially overlaps with its feasibility objection under § 1129(a)(11). The Court agrees that the evidence does not establish with certainty that every payment will be made. However, § 1191(c)(3)(B)(i) does not require certainty. The Debtor need only establish a reasonable likelihood that it will be able to make the payments provided for under the Plan. The Court finds that the preponderance of the evidence satisfies that standard for the reasons discussed above. The remaining question under § 1191(c)(3)(B) is whether the Plan provides appropriate remedies if the anticipated payments are not made.

Courts have differed as to what constitutes an "appropriate remedy" under § 1191(c)(3)(B)(ii). *See generally* 8 COLLIER ON BANKRUPTCY P 1191.04 (collecting cases). Under the more permissive approach, provisions permitting creditors to return to the bankruptcy court to enforce the plan or to pursue remedies available under applicable nonbankruptcy law may suffice. *See id.* Other courts require more specific protection, reasoning that ordinary collection remedies may prove inadequate if assets have been depleted by the time of default and may encourage a race among creditors for the remaining assets. *See id.*

Here, the First Amended Plan provides protections beyond ordinary post-default collection remedies. The Plan Trustee is charged with administering the settlement payment stream and is expressly authorized to protect and enforce the Liquidating Debtor's rights under the settlement. The Plan also establishes a specific default procedure. Under the Plan, a creditor asserting a default must provide written notice to the Debtor and Plan Trustee, and, if the default remains uncured for sixty days, the creditor may pursue any remedies available under applicable nonbankruptcy law.

Moreover, the settlement materially enhanced the protections associated with the payment obligations. Unlike the former deferred annuity obligations, the restructured payment obligations are secured by available assets of EverGlade and the intermediate ownership entities as well as personally guaranteed by Eric and Jerry Jia-Sobota. The Plan Trustee has authority to enforce the settlement and related obligations. Thus, if the Debtor fails to make the payments contemplated by the Plan, the Plan Trustee has identifiable collateral and additional obligors against which to exercise the enforcement rights provided by the Settlement.

Considering all these protections, the Court finds that the First Amended Plan provides appropriate remedies within the meaning of § 1191(c)(3)(B)(ii). The Plan provides the Plan Trustee with enforcement authority, sets forth a defined procedure following default, preserves recourse under nonbankruptcy law, and supplements those remedies with collateral and personal guaranties. Accordingly, the Court finds that the Debtor has established a reasonable likelihood that it will be able to make the payments contemplated by the First Amended Plan and that the Plan provides appropriate remedies if those payments are not made. The Court therefore concludes that the First Amended Plan satisfies the "fair and equitable" requirements of § 1191(c).

**F. The Plan Satisfies the Best Interests of Creditors Test.**

Section 1129(a)(7) requires that each holder of an impaired claim who has not accepted the Plan receive or retain property having a value that is not less than the amount such holder would receive if the Debtor were liquidated under Chapter 7 on the effective date of the Plan. BDO contends the Plan fails this requirement because a Chapter 7 trustee would reject the Bankruptcy Rule 9019 settlement, pursue fraudulent transfer and related claims against the settling parties, and obtain a greater recovery for unsecured creditors than the recovery contemplated by the Plan. BDO likewise argues that the Plan improperly releases valuable estate claims without receiving equivalent value in return.

BDO's best-interests objection rests largely on the premise that the Court rejected in approving the Bankruptcy Rule 9019 settlement, that is, that litigation of the estate's prepetition claims would produce a greater recovery for creditors than the settlement. The Court approved the settlement after conducting an evidentiary hearing and considering BDO's objections. In doing so, the Court found that the settlement was the product of arm's-length negotiations, that it was fair and equitable, that it afforded the estate a higher likelihood of providing a dividend to creditors than continued litigation, and that it was in the best interests of the Debtor, its estate, and its creditors. The First Amended Plan implements that settlement.

BDO disagrees with the Court's approval of the settlement, and its appeal preserves those arguments. Unless that order is reversed, however, the Court will not disregard its prior findings or assume, contrary to those findings, that a Chapter 7 trustee would obtain a superior result through continued litigation. Thus, having considered the evidence presented at confirmation, the terms of the approved settlement, and the entire record of this case, the Court concludes that the Debtor has established that the Plan satisfies the best interests of creditors test under § 1129(a)(7).

**G. BDO's Remaining Objections Do Not Preclude Confirmation.**

BDO's remaining objections concern the treatment of claims and the disposition of estate assets under the Plan. Although these objections identify potential ambiguities, none requires denial of confirmation. The remaining issues can be addressed through appropriate provisions in the confirmation order.

First, at the confirmation hearing, BDO pointed to the Plan's treatment of Class 2 unsecured claims. The Plan provides that Class 2 will receive its pro rata share of quarterly disposable income "in full satisfaction" of its claims. BDO argued that this language does not make clear whether recoveries from retained causes of action will also be distributed to Class 2. In particular, BDO objected that the Plan permits the Liquidating Debtor to retain potentially valuable causes of action without expressly providing that the proceeds of those causes of action will be distributed to unsecured creditors. Relatedly, BDO identifies potential causes of action that it contends have not been adequately scheduled or preserved, including a possible malpractice claim against A. Vason Hamrick and Jordan Price and potential avoidance claims involving Dan Paterson and Andrew Stiles, including claims relating to approximately $542,543 in alleged severance payments.

These arguments do not require denial of confirmation. The Plan makes clear and there is no dispute that any net recoveries from causes of action preserved under the Plan will be distributed to Class 2 unsecured creditors in accordance with the Plan. Further, the Plan makes clear and there is no dispute that the Plan's reference to distributions of quarterly disposable income "in full satisfaction" of Class 2 claims does not limit Class 2's entitlement to distributions from recoveries on retained causes of action.

BDO also seeks equitable subordination of Eric Jia-Sobota's $110,000 claim under Bankruptcy Code § 510(c), based on his insider status and alleged inequitable conduct. That request concerns the allowance and priority of Jia-Sobota's claim, not whether the Plan may be

confirmed. Nothing in the confirmation order should foreclose a timely request for equitable subordination.

Next, BDO also argues that confirmation should be delayed until it has fully litigated its nondischargeability claim under § 523(a)(6). But the potential effect of confirmation on BDO's claim is not an independent basis for denying confirmation. Discharge, to the extent provided by the Bankruptcy Code and the Plan, is a consequence of confirmation; it is not a reason to withhold confirmation from a plan that otherwise satisfies the requirements of § 1129. BDO's desire to preserve its § 523(a)(6) litigation therefore does not preclude confirmation.

Finally, BDO objects to the Debtor's projected-disposable-income calculation to the extent it contemplates a distribution to the Law Offices of L.W. Cooper on a prepetition claim that Cooper waived as a condition of its retention. A waived claim is not entitled to a distribution under the Plan. To eliminate any ambiguity, the confirmation order must provide that Cooper will receive no distribution on its waived prepetition claim.

**III. CONCLUSION**

Having considered BDO's objections and the evidence presented at confirmation, the Court concludes that the Debtor has established by a preponderance of the evidence that the First Amended Plan satisfies the applicable requirements for confirmation under §§ 1129 and 1191. BDO's objections are overruled, and the First Amended Plan will be confirmed with the clarifications described above. The Debtor shall submit a proposed confirmation order consistent with this decision.

Signed on 9/30/2026

Brenda T. Rhoades KC

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE